**STATE of Alaska, Appellant/Cross–Appellee,**

v.

**PLANNED PARENTHOOD OF ALAS-KA and Jan Whitefield, M.D., Appellees/Cross–Appellants.**

Nos. S–11365, S–11386.

Supreme Court of Alaska.

Nov. 2, 2007.

Rehearing Denied Dec. 14, 2007.

Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Appellant and Cross–Appellee.

Janet Crepps, Center for Reproductive Rights, Simpsonville, South Carolina, and Suzanne Novak, Center for Reproductive Rights, New York, New York, and Jeffrey M. Feldman, Feldman & Orlansky, Anchorage, for Appellees and Cross–Appellants, and Cooperating Attorney for the Alaska Civil Liberties Union.

Paul Benjamin Linton, Northbrook, Illinois, and Robert Flint, Hartig, Rhodes, Hoge & Lekisch, Anchorage, for Amicus Curiae Alaska State Legislature.

Kenneth C. Kirk, Kenneth Kirk & Associates, Anchorage, for Amicus Curiae Family Research Council.

Wayne Anthony Ross, Ross & Miner, Anchorage, for Amicus Curiae Americans United for Life.

Geoffrey G. Currall, Keene & Currall, Ketchikan, for Amicus Curiae Liberty Legal Institute.

Sara Trent, Anchorage, Cooperating Attorney for the Alaska Civil Liberties Union, and Kent A. Yalowitz, Arnold & Porter LLP, New York, New York, for Amicus Curiae Alaska Chapter of the American Academy of Pediatrics.

Erica A. Green and Deborah Kovsky–Apap, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C., and Christine Schleuss, Friedman Rubin & White, Anchorage, for Amici Curiae American College of Obstetricians and Gynecologists, Society of Adolescent Medicine, and Physicians for Reproductive Choice and Health.

Janell Hafner, Reges & Boone, LLC, Juneau, and Stacey I. Young, Women's Law Project, Pittsburgh, Pennsylvania, for Amici Curiae National Association of Social Workers Alaska Chapter, Alaska Women's Lobby, Alaska Pro–Choice Coalition, National Cen-

ter for Youth Law, Juvenile Law Center, and Jane's Due Process.

Debra J. Brandwein, Foster Pepper Rubini & Reeves LLC, Anchorage, for Amicus Curiae Northwest Women's Law Center.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

From time to time, we are called upon to decide constitutional cases that touch upon the most contentious moral, ethical, and political issues of our day. In deciding such cases, we are ever mindful of the unique role we play in our democratic system of government. We are not legislators, policy makers, or pundits charged with making law or assessing the wisdom of legislative enactments. We are not philosophers, ethicists, or theologians, and "cannot aspire to answer" fundamental moral questions or resolve societal debates.[1] We are focused only on upholding the constitution and laws of the State of Alaska.

Today, we are once again called upon to decide a case that implicates the controversial issue of abortion; more specifically, we are called upon to decide whether the Parental Consent Act impermissibly infringes upon a minor's fundamental right to privacy when deciding whether to terminate a pregnancy. We decide today that the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy. And contrary to the arguments of Planned Parenthood, we determine that the constitution permits a statutory scheme which ensures that parents are notified so that they can be engaged in their daughters' important decisions in these matters. But we ultimately conclude that the Act does not strike the proper constitutional balance between the State's compelling interests and a minor's fundamental right to privacy.

This is the second time that this case has been before us, and we earlier held that the privacy clause of the Alaska Constitution extends to minors as well as adults and that the State may restrict a minor's privacy right "only when necessary to further a compelling state interest and only if no less restrictive means exist to advance that interest."[2] The State's asserted interest in protecting a minor from her own immaturity by encouraging parental involvement in her decision-making process is undoubtedly compelling. But by prohibiting a minor from obtaining an abortion without parental consent, the Act effectively shifts that minor's fundamental right to choose if and when to have a child from the minor to her parents. There exists a less burdensome and widely used means of actively involving parents in their minor children's abortion decisions: parental notification.[3] The United States Supreme Court has recognized, in a different context, that "notice statutes are not equivalent to consent statutes because they do not give anyone a veto power over a minor's abortion decision."[4] And many states currently employ this less restrictive approach. Because the State has failed to establish that the greater intrusiveness of a statutory scheme that requires parental consent, rather than parental notification, is necessary to achieve its compelling interests, the Parental Consent Act does not represent the least restrictive means of achieving the State's interests and therefore cannot be sustained.

## II. FACTS AND PROCEEDINGS

In 1997 the Alaska Legislature passed the

---

1. *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska,* 28 P.3d 904, 906 (Alaska 2001) (noting that we do not decide "philosophical questions about abortion which we, as a court of law, cannot aspire to answer").

2. *State v. Planned Parenthood of Alaska,* 35 P.3d 30, 41 (Alaska 2001) (*Planned Parenthood I*).

3. *Ohio v. Akron Ctr. for Reproductive Health,* 497 U.S. 502, 511, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (citing *H.L. v. Matheson,* 450 U.S. 398, 411 n. 17, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981)).

4. *Id.*

Alaska Parental Consent Act (PCA).[5] The PCA prohibits doctors from performing an abortion on an "unmarried, unemancipated woman under 17 years of age" without parental consent or judicial authorization.[6] The Act subjects doctors who knowingly perform abortions on minors without the required consent or judicial authorization to criminal prosecution.[7] The parental consent requirement can be met through written consent from a parent, guardian, or custodian of the minor.[8] The Act also includes a judicial bypass procedure whereby a minor may file a complaint in superior court and obtain judicial authorization to terminate a pregnancy if she can establish by clear and convincing evidence either that she is "sufficiently mature and well enough informed to decide intelligently whether to have an abortion" or that being required to obtain parental consent would not be in her best interests.[9] If the court fails to hold a hearing within five business days after the complaint is filed, the court's inaction is considered a constructive order authorizing the minor to consent to terminate the pregnancy.[10]

On July 25, 1997, Planned Parenthood, Drs. Jan Whitefield and Robert Klem, and ten unidentified Jane Does filed a complaint in superior court seeking declaratory and injunctive relief. The complaint alleged that the PCA violates state constitutional rights to privacy, equal protection, and due process. On January 7, 1998, the plaintiffs filed a motion for summary judgment. The superior court granted that motion, concluding that the PCA violates the equal protection clause of the Alaska Constitution. The superior court also concluded that the privacy clause

of the Alaska Constitution protects minors as well as adults. However, in light of its equal protection ruling, the superior court did not decide whether the PCA violates the Alaska Constitution's privacy clause.

The State appealed, and on November 16, 2001, we issued our decision in *Planned Parenthood I.*[11] In that case, we concluded that the privacy clause of the Alaska Constitution extends to minors as well as adults and that the State may constrain a pregnant minor's privacy right "only when necessary to further a compelling state interest and only if no less restrictive means exist to advance that interest."[12] We also reversed the grant of summary judgment and remanded the case for an evidentiary hearing to determine whether the PCA actually furthers compelling state interests using the least restrictive means available.[13]

On October 4, 2002, prior to the evidentiary hearing on remand, the plaintiffs again moved for summary judgment, this time arguing that the PCA violates the constitution by failing to exclude abortions performed in medical emergencies. On January 2, 2003, the superior court denied the motion for summary judgment.

From January 6 to January 24, 2003, the superior court held a bench trial to hear evidence regarding the constitutionality of the PCA. On October 13, 2003, the superior court issued a decision on remand holding that the PCA is unconstitutional because it fails to further compelling state interests using the least restrictive means available. On January 7, 2004, the superior court entered judgment declaring that the PCA was unconstitutional under the equal protection and

5. Ch.14, §§ 1–10, SLA 1997.

6. AS 18.16.010(a)(3); AS 18.16.020.

7. AS 18.16.010(c). The Act provides the doctor with an affirmative defense to prosecution and civil liability where compliance with the Act was not possible "because an immediate threat of serious risk to the life or physical health of the pregnant minor from the continuation of the pregnancy created a medical emergency necessitating the immediate performance or inducement of an abortion." AS 18.16.010(g). We note that the superior court interpreted this statutory language as "broad enough" to "contain[ ] an appropriate medical emergency exception."

8. AS 18.16.020(1).

9. AS 18.16.030.

10. AS 18.16.030(c). Similar time limits apply to this court's consideration of a minor's appeal from a denied petition. AS 18.16.030(j).

11. 35 P.3d 30 (Alaska 2001).

12. *Id.* at 41.

13. *Id.* at 46.

privacy clauses of the Alaska Constitution and enjoining the State from enforcing the Act.

The State now appeals the superior court's judgment. The plaintiffs cross-appeal the superior court's denial of their motion seeking summary judgment based on the absence of a medical emergency exception.

## III. STANDARD OF REVIEW

■■■ We review the superior court's factual determinations for clear error.[14] We review constitutional questions de novo, adopting the most persuasive rule of law in light of precedent, reason, and policy.[15] We uphold a statute against a facial constitutional challenge if "despite any occasional problems it might create in its application to specific cases, [the statute] has a plainly legitimate sweep."[16]

## IV. DISCUSSION

■■■ Under our case law, we begin our analysis in cases such as the one at hand by measuring the weight and depth of the individual right at stake so as to determine the proper level of scrutiny with which to review the challenged legislation.[17] If this individual right proves to be fundamental, we must then review the challenged legislation strictly, allowing the law to survive only if the State can establish that it advances a compelling state interest using the least restrictive means available.[18] In cases involving the right to privacy, the precise degree to which

the challenged legislation must actually further a compelling state interest and represent the least restrictive alternative is determined, at least in part, by the relative weight of the competing rights and interests.[19] As we have previously explained, "the rights to privacy and liberty are neither absolute nor comprehensive ... [and] their limits depend on a balance of interests."[20]

### A. The Individual Right at Stake Is Fundamental.

■■■ The plaintiffs assert that the PCA burdens minors' fundamental right to privacy under article I, section 22 of the Alaska Constitution.[21] This section of the constitution maintains that "[t]he right of the people to privacy is recognized and shall not be infringed." As we have previously explained, the primary purpose of this section is to protect Alaskans' "personal privacy and dignity against unwarranted intrusions by the State."[22] Because this right to privacy is explicit, its protections are necessarily more robust and "broader in scope" than those of the implied federal right to privacy.[23]

Included within the broad scope of the Alaska Constitution's privacy clause is the fundamental right to reproductive choice. As we have stated in the past, "few things are more personal than a woman's control of her body, including the choice of whether and when to have children," and that choice is therefore necessarily protected by the right

---

**14.** *Grimm v. Wagoner,* 77 P.3d 423, 427 (Alaska 2003).

**15.** *Treacy v. Municipality of Anchorage,* 91 P.3d 252, 260 (Alaska 2004).

**16.** *Id.* at 260 n. 14.

**17.** *Ravin v. State,* 537 P.2d 494, 497 (Alaska 1975).

**18.** *Planned Parenthood I,* 35 P.3d at 41.

**19.** *Cf. Sampson v. State,* 31 P.3d 88, 91 (Alaska 2001).

**20.** *Id.*

**21.** Because we conclude that the PCA violates the right to privacy under the Alaska Constitution, we need not address the plaintiffs' argu-

ments that the Act also violates the equal protection clause or that the superior court erred in interpreting the Act to include a medical emergency exception.

**22.** *Luedtke v. Nabors Alaska Drilling Inc.,* 768 P.2d 1123, 1129 (Alaska 1989) (quoting *Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 148 (Alaska 1977)).

**23.** *See Ravin,* 537 P.2d at 514–15 (Boochever, J., concurring) (reasoning that "[s]ince the citizens of Alaska ... enacted an amendment to the Alaska Constitution expressly providing for a right to privacy not found in the United States Constitution, it can only be concluded that that right is broader in scope than that of the Federal Constitution").

to privacy.[24] Of course, our original decision concerning the fundamental right to reproductive choice specifically addressed only the privacy interests of adult women, but because the "uniquely personal physical, psychological, and economic implications of the abortion decision . . . are in no way peculiar to adult women,"[25] its reasoning was and continues to be as applicable to minors as it is to adults.[26] Thus, in *Planned Parenthood I*, we explicitly extended the fundamental reproductive rights guaranteed by the privacy clause to minors.[27]

In the case at hand, the PCA requires minors to secure either the consent of their parent or judicial authorization before they may exercise their uniquely personal reproductive freedoms. This requirement no doubt places a burden on minors' fundamental right to privacy. As such, the PCA must be subjected to strict scrutiny and can only survive review if it advances a compelling state interest using the least restrictive means of achieving that interest.[28]

## B. The State's Asserted Interests Are Compelling.

The State asserts that the PCA works, on the most generalized level, to advance two interrelated interests: protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities.[29] We agree with the State that these are compelling interests.

■ Although the Alaska Constitution extends the right to privacy in equal measure to both minors and adults, it is not blind to the unique vulnerabilities and needs that accompany minority. As we noted in *Planned Parenthood I*, state interests that are inapplicable to adults may sometimes be compelling with regard to minors.[30] And this is certainly the case with regard to the State's asserted interest in protecting minors from their own immaturity. Lacking in "experience, perspective, and judgment," minors often do not possess the capacity to make informed, mature decisions, and are therefore susceptible to a host of pitfalls and dangers unknown in adult life.[31] As we have recognized in the past, the State has a special, indeed compelling, interest in the health, safety, and welfare of its minor citizens and may properly take affirmative steps to safeguard minors from their own immaturity.[32]

■ Insofar as and to the same extent that the State has an interest in protecting minors, so too does it have an interest in aiding parents to fulfill their parental respon-

24. *Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 968 (Alaska 1997) (internal quotations omitted).

25. *Planned Parenthood I*, 35 P.3d at 40 (internal quotations omitted).

26. *Id.* (noting that "[d]eciding whether to terminate a pregnancy is at least as difficult, and the consequences of such decisions are at least as profound, for minors as for adults").

27. *Id.*

28. The dissent appears to liken a minor's decision of whether to terminate a pregnancy to decisions about attending school field trips, joining sports teams, viewing "R"-rated movies, and lifting weights at the gym. But this analogy overlooks the fundamental autonomy at stake in an adolescent's control over her own body. And in other important ways, a minor's decision to terminate a pregnancy is wholly unlike these decisions—the immediacy of the need to address the situation, coupled with the lasting and profound consequences of the decision, make it utterly unlike the day-to-day decisions mentioned by the dissent.

29. More specifically, the State asserts that the PCA aims to (1) ensure that minors make an informed decision on whether to terminate a pregnancy; (2) protect minors from their own immaturity; (3) protect minors' physical and psychological health; (4) protect minors from sexual abuse; and (5) strengthen the parent-child relationship.

30. 35 P.3d at 41 (quoting *Am. Acad. of Pediatrics v. Lungren*, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 819 (1997)) (stating that a "statute's relationship to minors properly is employed in the constitutional calculus in determining whether an asserted state purpose or interest is 'compelling' ").

31. *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

32. *See, e.g., Planned Parenthood I*, 35 P.3d at 40 (noting that "we have long emphasized the State's special interest in protecting the health and welfare of children").

sibilities. A minor child "is not [a] mere creature of the state,"[33] and the "affirmative process of teaching, guiding, and inspiring"[34] a minor child is, in large part, "beyond the competence of impersonal political institutions."[35] Parents, therefore, have an "important 'guiding role' to play in the upbringing of their children."[36] Indeed, it is the right and duty, privilege and burden, of all parents to involve themselves in their children's lives; to provide their children with emotional, physical, and material support; and to instill in their children "moral standards, religious beliefs, and elements of good citizenship."[37] We thus echo the United States Supreme Court's statement that, "[u]nder the Constitution, the State can 'properly conclude that parents . . . who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid [in the] discharge of that responsibility.' "[38]

### C. The PCA Is Not the Least Restrictive Means of Achieving the State's Compelling Interests.

■■■ Having identified and weighed the rights and interests at stake, we now turn to the task of assessing whether the PCA advances the State's compelling interests using the least restrictive means available.

We recognize that the legislature has made a serious effort to narrowly tailor the scope of the PCA by exempting seventeen-year-olds and other categories of pregnant minors from the Act's ban. It is true that the PCA is less restrictive than many other state stat-

utes in terms of the scope of its coverage. But scope is only one of the important criteria that determine the extent to which a parental involvement law restricts minors' privacy rights. The method by which the statute involves parents is also central to determining whether the Act's provisions constitute the least restrictive means of pursuing the State's ends.

By prohibiting minors from terminating a pregnancy without the consent of their parents, the PCA bestows upon parents what has been described as a "veto power" over their minor children's abortion decisions.[39] This "veto power" does not merely restrict minors' right to choose whether and when to have children, but effectively shifts a portion of that right from minors to parents. In practice, under the PCA, it is no longer the pregnant minor who ultimately chooses to exercise her right to terminate her pregnancy, but that minor's parents. And it is this shifting of the locus of choice—this relocation of a fundamental right from minors to parents—that is constitutionally suspect. For a review of statutory schemes enacted around the nation reveals a widely used legislative alternative that does not shift a minor's right to choose: parental notification.

Currently, fifteen states have parental notification statutes in place.[40] Although the precise details of these statutes vary, they all prohibit minors from terminating a pregnancy until their parents have been notified and afforded an appropriate period of time to actively involve themselves in their minor children's decision-making processes.[41] Stat-

---

33. *Bellotti*, 443 U.S. at 637, 99 S.Ct. 3035 (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)).

34. *Id.* at 638, 99 S.Ct. 3035.

35. *Id.*

36. *H.L. v. Matheson*, 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

37. *Wisconsin v. Yoder*, 406 U.S. 205, 233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

38. *Bellotti*, 443 U.S. at 639, 99 S.Ct. 3035 (quoting *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)).

39. *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 511, 110 S.Ct. 2972, 111 L.Ed.2d

. 405 (1990) (citing *Matheson*, 450 U.S. at 411 n. 17, 101 S.Ct. 1164).

40. Colo Rev. Stat Ann. § 12–37.5–101 to 107; Del.Code Ann. tit. 24, §§ 1780–1789(B); Fla. Stat. § 390.01114; Ga.Code Ann. § 15–11–110 to 114; Ill Comp. Stat. 70/1–99; Iowa Code § 135L.3; Kan. Stat. Ann. §§ 65–6701 to 6709; Md.Code Ann., Health-Gen. § 20–103; Minn.Stat. § 144.343; Mont.Code Ann. §§ 50–20–201 to 215; Neb Rev. Stat. §§ 71–6901 to 6908; Nev Rev.Stat. 442.255; NJ Stat. Ann § 9:17A–1.1 to 1.12; S.D. Codified Laws § 34–23A–7; W. Va Code §§ 16–2F–1 to 9.

41. *See, e.g.,* Ga.Code Ann. § 15–11–112(a) (prohibiting physicians from performing an abortion on a minor unless the physicians give either "24 hours' actual notice, in person or by telephone,

ed another way, these statutes seek to involve parents, not by giving them "veto power," but by giving them notice and time to consult with and guide their daughters through this important decision. As such, although parental notification statutes undoubtedly burden the privacy rights of minors, they do not go so far as to shift a portion of those rights to parents.

Of course, as the dissent emphasizes, the PCA does include a judicial bypass procedure through which some minors may effectively regain the right to reproductive choice by obtaining judicial authorization to forgo parental consent.[42] The State argues that "judicial bypass is the means by which a girl can *relieve herself of the burden of parental consent.*" (Emphasis in original.) But the State and its supporting amici fail to effectively rebut the trial court's express findings to the contrary. According to the superior court's findings, the PCA's bypass procedures build in delay that may prove "detrimental to the physical health of the minor," particularly for minors in rural Alaska who "already face logistical obstacles to obtaining an abortion." The trial court found that judicial bypass procedures "will increase these problems, delay the abortion, and increase the probability that the minor may not be able to receive a safe and legal abortion." The State has not expressly challenged as "clearly erroneous" the superior court's findings on this point but dismisses these concerns, arguing that "[r]ural Alaskan girls will pursue bypass on the same trip to the same urban location where they must go to obtain their procedures." But not all minors possess the wherewithal to embark upon a formal legal adjudication during a time of crisis.

Moreover, the inclusion of this judicial bypass procedure does not reduce the restrictiveness of the PCA relative to a parental notification statute. Every state to enact a parental notification regime has opted to include either a judicial bypass procedure similar to the PCA's procedure or an even more permissive bypass procedure.[43] As such, the PCA's inclusion of a judicial bypass procedure does not set the PCA apart from or reduce its intrusiveness relative to parental notification statutes.

Ultimately, because the PCA shifts the right to reproductive choice to minors' parents, we must conclude that the PCA is, all else being held equal, more restrictive than a parental notification statute. The State has failed to establish that the "greater intrusiveness of consent statutes" is in any way necessary to advance its compelling interests. In fact, in its briefing before us, the State has not focused on the PCA's benefits as flowing directly from the parental "veto power"; instead, it has consistently suggested that the PCA's benefits flow from increased parental communication and involvement in the decision-making process. According to the State, the PCA protects minors from their own immaturity by increasing "adult supervision"; it protects the physical, emotional, and psychological health of minors, "[p]articularly in the post-abortion context, [by increasing] parental participation . . . for the purposes of monitoring . . . risks"; it ensures that minors give informed consent to the abortion procedure by making it more likely that they will receive "counsel that a doctor cannot give, advice, adapted to her unique family situation, that covers the moral, social and religious aspects of the abortion decision"; it

---

to a parent or guardian" or twenty-four hours' written notice, which is deemed delivered forty-eight hours after mailing); Iowa Code § 135L.3(1) (prohibiting physicians from performing an abortion on a minor "until at least forty-eight hours' prior notification is provided to a parent of the pregnant minor").

42. AS 18.16.030(e)-(f) provides that a minor may bypass the PCA's parental consent requirement if a court determines by clear and convincing evidence that she is sufficiently mature and well enough informed to decide whether to have an abortion or that parental consent would not be in her best interests.

43. *See, e.g.,* Md.Code Ann., Health-Gen § 20–103(c)(1) (providing that a physician may perform an abortion without notice to a parent or guardian if, "in the professional judgment of the physician[,] . . . [n]otification would not be in the best interest of the minor"); W. Va.Code § 16–2F–3(c) (providing that parental notification may be "waived by a physician, other than the physician who is to perform the abortion, if such other physician finds that the minor is mature enough to make the abortion decision independently or that notification would not be in the minor's best interest").

protects minors from sexual abuse since "once appr[ ]ised of a young girl's pregnancy, parents ... will ask who impregnated her and will report any sexual abuse"; and it strengthens the parent-child relationship by "increas[ing] parental involvement," "parental consultation," and open and honest communication.

These expressed legislative goals—increased parental communication, involvement, and protection—are no less likely to accompany parental notification than the parental "veto power." The dissent suggests that where a minor forgoes judicial bypass, parental consent guarantees "a conversation." But it guarantees no more than a one-way conversation and "allows parents to refuse to consent not only where their judgment is better informed and considered than that of their daughter, but also where it is colored by personal religious belief, whim, or even hostility to her best interests."[44]

Notification statutes protect minors "by enhancing the potential for parental consultation concerning a [minor's] decision."[45] In fact, to the extent that parents who do not possess a "veto power" over their minor children's abortion decision have a greater incentive to engage in a constructive and ongoing conversation with their minor children about the important medical, philosophical, and moral issues surrounding abortion, a notification requirement may actually better serve the State's compelling interests.

In sum then, the PCA does not represent the least restrictive means of achieving the State's asserted interests and therefore cannot be sustained. In reaching this decision, we go no further than the Alaska Constitution demands, and merely reaffirm that the State does not strike the proper constitutional balance between its own compelling interests and the fundamental rights of its citizens by adopting an unnecessarily restrictive statute.

## V. CONCLUSION

For the reasons detailed above, we AFFIRM the superior court's decision striking down the Parental Consent Act as a violation of the Alaska Constitution's right to privacy.

CARPENETI, Justice, with whom MATTHEWS, Justice, joins, dissenting.

In 1997, faced with competing interests of the highest constitutional level—an underage pregnant girl's constitutional right to privacy in deciding whether to terminate her pregnancy, her parents' constitutional right (and duty) to protect her best interests, and the state's compelling interests in protecting children against their own immaturity—the Alaska Legislature carefully crafted the Alaska Parental Consent Act in an effort to recognize and protect all of these interests. That law is fully consistent with United States Supreme Court precedent, yet today's opinion strikes it down. Because this court's rejection of the legislature's thoughtful balance is inconsistent with our own case law and unnecessarily dismissive of the legislature's role in expressing the will of the people, I respectfully dissent.

## I. The Constitutional Framework

Before looking at the Parental Consent Act in detail to determine how it balances the strong competing interests involved, it is helpful to consider the analytical framework used by courts in deciding constitutional challenges of the kind involved in this case. In a series of cases, we have established a three-step process. We have first looked to the nature and extent of the individual right that is claimed. If we determine that the right is fundamental, we then examine whether the state's interest in burdening the

---

**44.** *State v. Koome,* 84 Wash.2d 901, 530 P.2d 260, 265 (1975) (holding that parental consent statute violates state constitutional right to privacy); *see also Am. Acad. of Pediatrics v. Lundgren,* 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 816 (1997) (holding that parental consent law "intrude[s] upon" a pregnant minor's "protected privacy interest under the California Constitution").

**45.** *Matheson,* 450 U.S. at 412, 101 S.Ct. 1164; *see also Planned Parenthood Ass'n of the Atlanta Area, Inc. v. Miller,* 934 F.2d 1462, 1472–74 (11th Cir.1991) (holding that Georgia's notification statute furthered the state's interest in "protecting immature minors" and promoting parental input).

individual right is compelling. If the state's interest is compelling, we look to make certain that there is a sufficiently close fit between the goals of the legislation and the means adopted by the state to reach those goals.

The individual right claimed in this case is the fundamental right of an unmarried pregnant minor to privacy in her decision whether to terminate her pregnancy. The compelling interest claimed by the state is multifaceted, including protecting minors from their own immaturity (by recognizing the parents' right (and duty) to guide their children's upbringing) and protecting the health of minors. If both the individual right is fundamental and the state's interest is compelling, the court must decide whether the law is tailored closely enough to achieve its intended purpose.

## II. The Alaska Parental Consent Act

The hallmark of the Alaska Parental Consent Act (PCA or the Act) is the remarkable length to which the legislature went in order to accommodate all of the various, and at times competing, interests that are involved when an unmarried teenage (or pre-teen) girl is faced with pregnancy.[1] In recognition of the primary role that parents are normally expected to play in the upbringing of their children, and in recognition of the fact that children are generally not considered competent to consent to medical procedures, the Act requires the consent of a parent in order for the child to undergo an abortion.[2] In recognition of the fact that divulging her pregnancy to her parents may in some instances be unnecessary or inappropriate—because the minor is sufficiently mature and intelligent to decide the question on her own or because her parent or parents have engaged in physical, sexual, or emotional abuse against her (or because obtaining their consent is otherwise not in the child's best interests)—the Act provides for a confidential and speedy "judicial bypass" procedure in which a judge decides whether the minor is competent to decide for herself.[3]

The legislature engrafted multiple exceptions to the scope of the Act in an effort to create a law that was specifically targeted, to the greatest extent possible, at the population of underage pregnant girls who would be in greatest need of adult guidance in reaching the decision whether to terminate pregnancy. First, the legislature exempted from the scope of the Act all seventeen-year-old girls.[4] The importance of this exemption can hardly be overstated. Studies consistently show that nearly half of all underage abortions are obtained by girls who have reached the age of seventeen.[5] Moreover, only one state consent law exempts seventeen-year-olds from its scope,[6] and only one state notifi-

---

**1.** In drafting the Alaska Parental Consent Act, the legislature appears to have tracked carefully the requirements for parental consent and parental notification laws set out by the United States Supreme Court in *City of Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); *Planned Parenthood Ass'n. of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), *partially overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

**2.** AS 18.16.020(1).

**3.** AS 18.16.020(2). In the event that the court fails to act, such failure will be considered to be judicial authorization for the abortion. AS 18.16.020(3).

**4.** AS 18.16.020.

**5.** Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 Family Planning Perspectives, Sept/Oct 1992 at Table 1. *See also* Letter from Susan K. Steeg, General Counsel, Texas Department of Health (May 26, 2004) (stating that of the 3654 minor women who obtained an abortion in Texas in 2002, 1694 or forty-six percent of them were age seventeen); Aida Torres, Jacqueline Darroch Forrest & Susan Eisman, *Telling Parents: Clinic Policies and Adolescent's Use of Family Planning and Abortion Services*, 12 Family Planning Perspectives, Nov/Dec 1980, 284, 287 (forty-four percent of the 1170 unmarried minor abortion patients surveyed were seventeen years old).

**6.** S.C.Code Ann. § 44–41–10(m) (2006).

cation law does so.[7] This exception also identifies the population of teenage girls most likely competent, by virtue of maturity and experience, to make the decision regarding abortion without adult assistance, and allows them to do so.

Second, the legislature exempted from the scope of the Act four additional classes of minors. Each exemption shows that the legislature was attempting to shape a law that would be applied only to those pregnant girls who would most be in need of adult help. Accordingly, the law does not apply to married minors,[8] to minors who have been legally emancipated,[9] to minors who have entered the armed services of the United States,[10] and to minors who have become employed and self-subsisting.[11]

Third, in an apparent effort to make certain that the Act would not have coverage over any other underage pregnant girls who were capable of making the decision on their own, the legislature included a catch-all exception to the Act: any who had "otherwise become independent from the care and control of [her] parent, guardian, or custodian." [12]

The legislature next created a judicial bypass procedure to cover those cases of underage pregnancy not covered by these exceptions. The judicial bypass procedure is designed to be confidential, speedy, cost-free to the child, and easy to use. The court system is directed to prepare forms for use by the child [13] without charge [14] and have them available at every court location in the state: superior court, district court, and magistrate.[15] Counsel shall immediately be made available without charge to any minor who seeks judicial bypass [16] and the forms shall contain this notification.[17] There are no filing fees to be charged [18] and no court costs assessed [19] against the child.

The proceedings surrounding judicial bypass are strictly confidential: Courts are instructed to conduct all proceedings so as to preserve the anonymity of the child.[20] Moreover, the Act specifically directs the court that it "may not notify the parents, guardian, or custodian" of the child that she is pregnant or seeks an abortion.[21] All papers and records pertaining to the matter "shall be kept confidential and are not public records" under Alaska law.[22]

In deference to the need for speedy resolution of the consent question in cases where an abortion is sought, the Act provides for extremely short timelines. The court is directed to set the hearing "at the earliest possible time" and in any event not more than five business days after the complaint is filed.[23] The court is directed to enter judgment "immediately after the hearing is ended." [24] If the hearing is not held by the fifth day after the case is filed, that failure will be considered to be a constructive authorization by the court for the child to consent to an abortion.[25] Similarly short deadlines apply to an appeal.[26]

7. Del.Code Ann. tit. 24 § 1782(6) (2007).

8. AS 18.16.020.

9. *Id.* and AS 18.16.090(2)(C).

10. AS 18.16.020, .090(2)(A).

11. AS 18.16.020, .090(2)(B).

12. AS 18.16.020, .090(2)(D).

13. AS 18.16.030(*l*).

14. *Id.*

15. AS 18.16.030(n).

16. AS 18.16.030(d). The only exception is that if the child already has counsel. *Id.*

17. AS 18.16.030(n)(3).

18. AS 18.16.030(n)(1).

19. AS 18.16.030(n)(2).

20. AS 18.16.030(k).

21. AS 18.16.030(h).

22. AS 18.16.030(k).

23. AS 18.16.030(c).

24. *Id.*

25. *Id.*

26. AS 18.16.030(j). *See also* Alaska R.App. P. 220.

As to the substance of the inquiry that the judge must make, it is straightforward and simple: The court determines whether the child is sufficiently mature and informed to make the decision to have an abortion.[27] (In those cases where the minor has alleged abuse by her parent or guardian, the court determines whether such abuse has occurred.[28]) If the child is sufficiently mature to make the decision (or if abuse has occurred and an abortion is in the minor's best interest), the court authorizes her to consent to an abortion; if she is not sufficiently mature to decide on her own or if there has not been abuse, the case is dismissed.[29]

In sum, the Alaska Parental Consent Act appears to be the product of a concerted effort to make certain that those pregnant girls who are sufficiently mature to make the decision to obtain an abortion on their own are allowed to do so while those who are not sufficiently mature either obtain a parent's consent or, in the case of parental abuse, a judicial determination that the procedure is in their best interest.

## III. Analysis

Application of the three-part test for constitutionality (set out above in the discussion of the constitutional framework) has tended in this case to focus on the third part of the test: whether the means chosen by the legislature are sufficiently narrowly tailored to the goals of the legislation. I agree that this inquiry is the most difficult in this case. But I also believe that failure to focus carefully on the nature of the interests involved can lead to a failure to assess correctly the success of the legislature's effort to tailor the legislation to meet its goals. For this reason, I turn now to each step of the test for constitutionality.

27. AS 18.16.030(e).

28. AS 18.16.030(f).

29. AS 18.16.030(e), (f).

30. 948 P.2d 963 (Alaska 1997).

31. *Id.* at 968.

### A. The Individual Right—To Exercise Autonomy in the Control of One's Body, and in the Choice to Bear a Child—Is Fundamental.

The individual right involved in this case is the right to privacy. While that right is often associated with the maintenance of secrecy or confidentiality with regard to one's affairs (and that is present to some extent in this case), the gravamen of the individual's concerns in this case is the right to exercise autonomy in the control of one's body. In *Valley Hospital Association v. Mat–Su Coalition for Choice*,[30] we relied on the need for a woman to have "control of her body, and the choice whether or when to bear children," [31] in determining that "reproductive rights are fundamental, and that they are encompassed within the right to privacy." [32]

But it is important to remember that *Valley Hospital* concerned the rights of adult women. Today's opinion relies on the court's statement in its earlier decision in this case that "minors and adults start from the same constitutional footing," [33] but it does not meet the promise of that earlier opinion fully to take into account the fact that the persons to whom the statute in this case is directed are children. In holding that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority," [34] the court's earlier opinion in this case hastened to add:

> Of course this does not mean that evidence of the "peculiar vulnerability of children [and] their inability to make critical decisions in an informed, mature manner" has no place in determining whether the parental consent or judicial authorization act is constitutional. To the contrary, we have long emphasized the state's special

32. *Id.* at 969.

33. Opinion at 581; *State v. Planned Parenthood of Alaska*, 35 P.3d 30, 41 (Alaska 2001) (*Planned Parenthood I*).

34. 35 P.3d at 40 (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)).

interest in protecting the health and welfare of children.[35]

The opinion then explained how this "peculiar vulnerability" of children was to be taken into account in the constitutional analysis: "[A] statute's relationship to minors properly is employed in the constitutional calculus in determining whether an asserted state purpose or interest is 'compelling.' "[36] Indeed, in support of its conclusion that minors enjoy a constitutional right to privacy similar to that of adults, this court quoted Justice Marshall's dissent in *H.L. v. Matheson*[37] that, rather than saying the minor's privacy right is somehow less fundamental than an adult's, "the more sensible view is that state interests inapplicable to adults may justify burdening the minor's right." [38] But when the court looks to the state's and parents' interests in this case, it treats them in conclusory fashion. A fuller exposition is warranted.

### B. The State's Interests—To Protect Children from Their Own Immaturity and To Protect Parents' Rights and Duties To Raise Their Children—Are Compelling.

Despite the promise of *Planned Parenthood I* to take into account the fact that children are involved during step two of the constitutional analysis—the step that asks "whether an asserted state purpose or interest is 'compelling' "—the court today quickly passes over this step.

The court's cursory discussion of the nature of the state's compelling interests at stake in this case is inconsistent with our case law on the right to privacy; moreover, it deprives the court's later means-to-ends

analysis of any context. Let us consider each of these failings in turn.

In *Sampson v. State*,[39] a privacy-based challenge to Alaska law precluding physician-assisted suicide, we set out the importance of carefully examining the *nature* of the competing interests involved. In upholding the ban on physician-assisted suicide, we said:

> This court has often emphasized the importance of personal autonomy under our constitution. Yet we have also recognized that the rights to privacy and liberty are neither absolute nor comprehensive—that their limits depend on a balance of interests. The nature of the balance varies with the importance of the rights actually infringed.[40]

Because the nature of the balance varies with the importance of the rights involved and because in the context of the case before us now—pregnant children who are considering abortion—there are important rights on both sides of the equation, including the rights of parents to guide their children, it is particularly important that the court look closely at the nature of the state's interests in the legislation.

The court's failure to look closely at the nature of the state's and parents' interests leaves its constitutional "balance" one-sided. Because the court has not fully and accurately set out the nature of society's compelling interest in the protection of children and of parents' right and duty to raise their children, it is impossible to accurately gauge how close the law comes to meeting its objectives. As a detailed look at the state's interest shows, it is multi-faceted and is served in many ways by Alaska's Parental Consent Law. It consists of at least two[41] separate aspects.

---

**35.** 35 P.3d at 40 (footnote omitted).

**36.** *Id.* at 41 (quoting *American Acad. of Pediatrics v. Lungren*, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 819 (1997)).

**37.** 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

**38.** *Id.* at 441 n. 32, 101 S.Ct. 1164.

**39.** 31 P.3d 88 (Alaska 2001).

**40.** 31 P.3d at 91 (footnotes omitted).

**41.** The superior court actually identified six compelling state interests in its opinion. They were as follows: (1) "State has a compelling interest in protecting minors from their own immaturity." (2) "State has a compelling interest in protecting the physical, emotional, and psychological health of minors." (3) "State has a compelling interest in ensuring that doctors obtain informed consent from their minor patients contemplating pregnancy related decisions." (4) "State has a compelling interest in protecting minors from sexual abuse...." (5) "The court finds that the state does have many interests, some of them compelling, in fostering and protecting the family structure...." (6) "This court

First, society has longstanding and pervasive interests in protecting children from their own immaturity. The United States Supreme Court has repeatedly recognized society's interest in protecting children from their own immaturity. In *Hodgson v. Minnesota*,[42] the Court held: "The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."[43] The Court noted that "[t]hat interest, which justifies state-imposed requirements that a minor obtain his or her parent's consent before undergoing an operation, marrying, or entering military service, extends also to the minor's decision to terminate her pregnancy."[44] In *Stanford v. Kentucky*,[45] Justice Brennan noted:

> [M]inors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life.
>
> ... Adolescents "are more vulnerable, more impulsive, and less self-disciplined than adults," and are without the same "capacity to control their conduct and to think in long-range terms."[46]

State courts too have long recognized that children require protection from their own immaturity. Pennsylvania, for example, has noted that the state's strong interest in protecting younger minors from the sexual aggressiveness of minors over sixteen is based on the immaturity and poor judgment of younger minors.[47] Similarly, Florida upheld a law prohibiting consensual sexual contact between minors sixteen and older and those under thirteen because the state had a compelling interest in "protecting twelve-year-olds from older teenagers and from their own immaturity in choosing to participate in harmful activity."[48]

As Justice Matthews set out in his dissent in our earlier consideration of this case, *Planned Parenthood I*:

> Children's freedoms have long been constrained in ways that would not be permissible for adults. Constraints on children are imposed in order to protect them, and sometimes society as a whole, from the consequences of their immaturity. Thus children may not exercise the fundamental right to vote. They generally may not make contracts or smoke cigarettes or drink alcoholic beverages or consent to

---

finds that protecting rights to a civil action is a compelling state interest."

42. 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990).

43. *Id.* at 444, 110 S.Ct. 2926.

44. *Id.* at 444–45, 110 S.Ct. 2926. *See also Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 490–91, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) ("A State's interest in protecting immature minors will sustain a requirement of a consent substitute, either parental or judicial."); *Parham v. J. R.*, 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments."); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 102–04, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (Stevens, J., concurring and dissenting) (minors may not make enforceable bargains, work, or travel where they please, attend exhibitions of constitutionally-protected adult motion pictures, marry, etc.); *Galle-*

gos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (holding that fourteen-year-old's criminal confession made without advice of adult violated due process because of child's inherent lack of maturity).

45. 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), *overruled by Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

46. *Id.* at 395, 109 S.Ct. 2969 (Brennan, J., dissenting) (quoting Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978)).

47. *Commonwealth v. Albert*, 563 Pa. 133, 758 A.2d 1149, 1154 (2000).

48. *J.A.S. v. State*, 705 So.2d 1381, 1386 (Fla. 1998). *See also In re E.G.*, 133 Ill.2d 98, 139 Ill.Dec. 810, 549 N.E.2d 322, 327 (1989) (holding that court should distinguish mature minors from immature minors for purpose of determining right to refuse medical treatment because "the State has a *parens patriae* power to protect those incompetent to protect themselves").

sexual intercourse. Without a parent's consent they may not become licensed drivers or get married or obtain general medical or dental treatment. Alaska's parental consent/judicial bypass act is in the tradition of these constraints on children's freedoms.... The act is designed to ensure that each child makes a decision that is best for her.[49]

The notion that parental consent laws further the state interest of protecting minors from their immaturity is neither novel nor surprising. As a matter of law society demands much of parents; it is expected that they will assist their children in making proper decisions until those children reach adulthood. Parents of teenagers and younger children are familiar with the ubiquitous "permission slips" which must be signed before their children may go on a school field trip; and parental permission is routinely required before minors may join a sports team, before an under-seventeen minor may view an "R"—rated movie, and before a minor may even lift weights at the local gym.[50] Parental involvement in the everyday decisions of their children enables parents to continue to help their children develop, even as the children grow older and more independent. The rights and obligations of parents to remain involved is intricately bound up with the rights of children to receive guidance and to be protected from their own immaturity. Courts have long recognized these interests: "[T]he custody, care and nurture of the child reside first in the par-

ents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." [51]

For an immature pregnant minor, parental involvement is at least as important in the difficult decision concerning abortion as it is in the "permission slip" activities mentioned in the last paragraph. In *Ohio v. Akron Center for Reproductive Health (Akron II )*,[52] a case concerning a parental notification requirement, the United States Supreme Court held that the requirement furthered the state's interest in helping minors to make more mature decisions.[53] Some minors may hesitate to seek parental advice if not required to by law because they are young and afraid. In those cases where a pregnant minor has been abused or fears an improper parental response, the PCA carves out a judicial bypass procedure whereby the minor may avoid all parental notification. However, it is improper for this court to assume that harmful parental responses will be a likely or typical response for the minors compelled to seek parental consent under the PCA. As Justice Kennedy noted in *Akron II*, "[i]t is both rational and fair for the State to conclude that, in most instances, the family will strive to give a lonely or even terrified minor advice that is both compassionate and mature." [54] Indeed, to prohibit states from ensuring that in most cases young women receive guidance from a parent when making this decision would "deny all dignity to the family." [55] Similarly, Justice Stevens noted that it is reasonable for a state legislature to

---

49. 35 P.3d at 46–47.

50. Today's Opinion mistakenly asserts that the dissent "appears to liken a minor's decision of whether to terminate a pregnancy to decisions about attending school field trips, joining sports teams, viewing "R"-rated movies, and lifting weights at the gym" and argues that the decision to terminate a pregnancy is wholly unlike these decisions. (Opinion 582, n. 28) The Opinion misses the point entirely: Of course permission-slip decisions do not have the "lasting and profound consequences" (Opinion 582, n. 28) of the abortion decision, *and yet the law imposes the necessity of parental consent upon them.* If society deems parental consent critical in such lesser matters, should not the parents play a similar role when the consequence to the child are so vastly greater? And in arguing that "fundamental autonomy [is] at stake in an adolescent's

control over her own body," (Opinion 582, n. 28) the Opinion ignores that parental consent is required for virtually every other medical procedure involving a child. *See Hodgson v. Minnesota,* 497 U.S. 417, 423, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (recognizing "the common-law requirement of parental consent for any medical procedure performed on minors.").

51. *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

52. 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

53. *Id.* at 519, 110 S.Ct. 2972.

54. *Id.* at 520, 110 S.Ct. 2972.

55. *Id.*

conclude that "most parents will be primarily interested in the welfare of their children," making the imposition of a consent requirement an "appropriate method of giving the parents an opportunity to foster that welfare by helping a pregnant distressed child to make and implement a correct decision."[56] Because pregnant minors in Alaska will normally benefit from the involvement of a parent in one of the most critical decisions they can ever make, the PCA furthers the state interests of protecting minors from their immaturity and preserving the rights of parents to raise their children.

The PCA seeks to protect a second compelling interest in abortion cases involving children. In addition to society's interest in protecting children from their own immaturity, we have long held that parents have a fundamental right in the raising of their children. In *S.O. v. W.S.*,[57] we noted that when the state seeks to terminate the parent-child relationship, the result may be the involuntary deprivation of "the fundamental natural right of parents to nurture and direct the destiny of their children."[58] *S.O.* relied on and quoted *Turner v. Pannick*,[59] in which Justice Dimond, in commenting on this fundamental right of parents to nurture and direct the upbringing of their children, stated: "This is a truth which one discovers by reason, and has the status of knowledge rather than mere opinion."[60] He noted that "[the family] forms the basic unit of our society" and is "one of the oldest institutions known to mankind."[61]

In sum, the norm in American, and Alaskan, life and law is that parents are a child's first and most important resource for assistance in decision-making. For that reason,

the state's interest in protecting children from the consequences of their own immaturity, and in so doing protecting the health of its children, and its interest in supporting parents' right and duty to guide the upbringing of their children is particularly compelling.

## C. The Fit Between the State's Interests and the Means Adopted To Reach Them Are Sufficiently Close To Pass Constitutional Muster.

We now reach the third part of the constitutional analysis. In order to survive constitutional scrutiny, the PCA must be narrowly tailored in meeting the state's interests. Because the child's privacy interests are fundamental, there must be no less restrictive alternative available to the state.[62] As the following shows, the PCA is narrowly tailored to its goals. In addition, the alternatives discussed by the superior court and today's opinion are either more restrictive than the PCA or ineffective at meeting the state's interests, or both.

### 1. The PCA is narrowly tailored.

Before embarking on this analysis, however, it is important to address the majority's assertion that "the PCA bestows upon parents what has been described as a 'veto power' over their minor children's abortion decisions."[63] Indeed, the claim that the PCA gives parents a "veto power" runs throughout today's Opinion,[64] and this supposed "veto power" may fairly be seen as the fundamental weakness of the PCA in the court's view. But the claim is false as it applies to minors who are sufficiently mature to make the decision, and it relies on

---

**56.** *Planned Parenthood v. Danforth*, 428 U.S. 52, 104, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (Stevens, J., concurring).

**57.** 643 P.2d 997 (Alaska 1982).

**58.** *Id.* at 1006.

**59.** 540 P.2d 1051 (Alaska 1975).

**60.** *Id.* at 1055 (Dimond, J., concurring).

**61.** *Id.* at 1055–56.

**62.** *Planned Parenthood I*, 35 P.3d 30, 41 (Alaska 2001).

**63.** Opinion at 583, quoting *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 511, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

**64.** *See, e.g.,* Opinion at 579 ("the Act effectively shifts that minor's fundamental right to choose if and when to have a child from the minor to the parents"); 4 ("veto power"); 12 (same); 13 (same); 15 ("the PCA shifts the right to reproductive choice to minors' parents"); 16 ("veto power").

quotation of the United States Supreme Court taken out of context. The claim is false because a pregnant minor faced with the abortion decision may decide to obtain an abortion *without parental consent* by using the judicial bypass procedure.[65] The quotation is taken out of context because the case it comes from, *Ohio v. Akron Center for Reproductive Health,* restated the Supreme Court's clearly established precedent "that, in order to *prevent* another person from having an absolute veto power over a minor's decision to have an abortion, a State must provide some sort of bypass procedure if it elects to require parental consent."[66] Thus, today's Opinion's repeated assertions that the PCA gives parents a veto power over their child's abortion decision is simply not true as applied to children who are sufficiently mature to make the decision. And its implication that the United States Supreme Court would regard the PCA as giving parents a "veto power" is equally wrong: Because the PCA does provide a bypass procedure, the Act—in the language of the Supreme Court—"prevent[s]" the parent from holding veto power.

The Parental Consent Act is very narrowly drawn to achieve its compelling state interests. To begin, as noted above, the PCA excludes all seventeen-year-olds.[67] We have seen that the exclusion of seventeen-year-olds is particularly noteworthy because almost half of minor abortions are performed on seventeen-year-old minors,[68] and thus by excluding seventeen-year-olds the legislature almost halved the pool to which the PCA applies. We have also seen that this narrowing of the minors covered by the Act is not arbitrary, but instead is tailored to eliminate those least likely to need the legislation: the most mature of the pregnant minors.

The use of age as a proxy for maturity is fundamental to our legal system and social culture. As the Supreme Court recently noted in *Roper v. Simmons,*[69] the difference in maturity levels between adults and children is evidenced by both common sense and science:

[A]s any parent knows and as the scientific and sociological studies ... tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.... Even the normal 16–year–old customarily lacks the maturity of an adult.... [A]dolescents are overrepresented statistically in virtually every category of reckless behavior. In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent.[70]

Age distinctions are not made with an expectation that they perfectly track maturi-

---

**65.** *See* AS 18.16.030. The judge in a bypass case must decide whether the child is "sufficiently mature and well enough informed to decide intelligently whether to have an abortion." If she is, the court issues an order authorizing her to consent to the procedure "without the consent of a parent, guardian, or custodian." AS 18.16.030(e). (If she is not, the court dismisses the case. *Id.* Presumably, a child found to be insufficiently mature to make such a decision should not make it.)

**66.** 497 U.S. at 510–11, 110 S.Ct. 2972 (emphasis added). Moreover, although the reference in today's Opinion to the use of "veto power" in the United States Supreme Court's opinions in *H.L. v. Matheson* and *Ohio v. Akron Center* is technically accurate (in the sense that the term appears in both opinions), it is also misleading. *Ohio v. Akron Center,* when it referred to *Matheson,* sim-

ply established that notice statutes are not equivalent to consent statutes for the purpose of constitutional analysis. Neither *Matheson* nor *Akron Center* directly addressed what types of bypass procedures are capable of curing the constitutionally fatal "veto power" found in consent statutes *without* bypass procedures. Instead, both *Matheson* and *Akron Center* dealt solely with the constitutionality of parental notification statutes.

**67.** AS 18.16.020.

**68.** *See supra* note 5.

**69.** 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

**70.** *Id.* at 569, 125 S.Ct. 1183 (internal quotations and citations omitted).

ty.[71] All minors under age eighteen are prohibited from voting not because it is unfathomable that a seventeen-year-old is capable of responsibly exercising the right to vote, nor is the prohibition based upon the assumption that all adults vote responsibly. Rather, the legal system accepts lack of perfection in meeting the state's interests in order to create a feasible, more convenient, and less intrusive system of governance. As Justice Holmes noted in *Louisville Gas & Electric Co. v. Coleman*:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless

we can say that it is very wide of any reasonable mark.[72]

The Alaska Court of Appeals similarly noted in *Allam v. State*[73] that "[s]tatutes [that set the age for possession of tobacco, possession of alcohol, age of consent for sexual intercourse, etc.,] and the social policy decisions that underlie them, are within the province of the legislature. There is no legal requirement that the same age of majority apply to all activities and circumstances."[74] By exempting seventeen-year-olds from the PCA, the legislature appropriately tailored the legislation to affect the less mature population of pregnant minors.

Significantly, this narrowing of the PCA based on age also makes it *less* restrictive than every other parental consent law but one[75] and *less* restrictive than all but one of the notification laws in effect in other states because all the rest apply to seventeen-year-olds,[76] as discussed in more detail below.

As noted, the legislature further tailored the PCA by excluding four additional categories of minors: legally emancipated minors,[77] married minors,[78] minors living independently,[79] and minors who are members of the

71. *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 104–05, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (Stevens, J., concurring and dissenting) ("In all ... situations [where state legislation seeks to protect minors from the consequences of decisions they are not prepared to make] chronological age has been the basis for imposition of a restraint on the minor's freedom of choice even though it is perfectly obvious that such a yardstick is imprecise and perhaps even unjust in particular cases.").

72. 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting).

73. 830 P.2d 435 (Alaska App.1992).

74. *Id.* at 438.

75. *See* S.C.Code Ann. § 44–41–10(m) (also defining minors as "under the age of seventeen").

76. Delaware appears to be the only exception among "notification" states. Del.Code Ann. tit. 24, § 1782(6) (requiring notification for those under age sixteen). *But cf.* Kan Stat Ann. § 65–6701(f) (2006); Md.Code Ann., Health-Gen. § 20–103 (2005); Minn.Stat. § 144.343 (2005); Mont. Code Ann. § 50–20–203(6) (2005); Neb Rev.Stat. § 71–6901(5) (2006); Nev.Rev.Stat. § 442.255 (2005); S.D. Codified Laws § 34–23A–7 (2006);

Tex. Fam.Code Ann. § 33.002 (2007); W. Va.Code § 16–2F–2 (2007).

77. AS 18.16.020 (applying the statute only to minors known to be "unmarried ... and unemancipated"). The majority opinion notes that a minor must prove by clear and convincing evidence that she is sufficiently mature in order to obtain a judicial bypass, while the standard of proof for legal emancipation is a preponderance of the evidence. Because any minor who has established legal emancipation is already exempted from the scope of the PCA, however, the PCA is not over-broad on this account. Furthermore, it is logical that a minor who cannot prove that she is globally ready to be free from parental supervision may nonetheless be mature on the specific issue of the decision to terminate her pregnancy. This discrepancy in what must be proven negates an easy comparison regarding the burden of proof that a minor must satisfy.

78. *Id.*

79. AS 18.16.090(2)(B). By its express terms the PCA provides a much broader interpretation of the term "unemancipated" than Alaska's formal emancipation statute, AS 09.55.590. The term is defined in AS 18.16.090(2):

"unemancipated" means that a woman who is unmarried and under 17 years of age has not done any of the following:

armed services.[80] These are hallmarks of maturity in our society. By excluding identifiably mature minors age sixteen and under, the legislature went a long way towards assuring that the legislation would not be over-inclusive. Furthermore, in these respects the PCA is less restrictive than every other state's notification laws that do not contain these exceptions.[81]

The final narrowing of the PCA is derived from the judicial bypass procedure. Although neither the superior court nor this court's majority analyze the bypass procedure under the least restrictive means test, the judicial bypass significantly narrows the effect of the law because it provides a way for mature minors who are not otherwise statutorily exempted to obtain an abortion without parental consent. As Justice Matthews recognized in *Planned Parenthood I*, the judicial bypass procedure satisfies all the criteria established by the United States Supreme Court in *Bellotti v. Baird*.[82] Indeed, the judicial bypass process was meticulously crafted with the minor's need for confidentiality and an expedited decision incorporated into the system. The PCA errs on the side of granting the judicial bypass whenever delay is threatened: If the superior court fails to provide a hearing within five business days of a minor filing the petition, the delay operates as an automatic finding in the minor's favor, resulting in a constructive waiver of the consent requirement. Similarly, if the minor loses in the superior court and the hearing on appeal is delayed more than five days after the docketing of the appeal, a constructive order must issue authorizing the minor to undergo the abortion.[83]

### 2. The PCA is the least restrictive means to achieve the state's compelling interests.

The PCA not only furthers a compelling state interest in a manner narrowly tailored and in compliance with the federal constitution, but it is also the least restrictive means of doing so. The least restrictive means test is properly a difficult burden for the state to meet, as it protects fundamental rights against unnecessary state intrusion. However, it is not an impossible standard for the state to meet. A mere showing that the state might have taken less restrictive action, say, by enacting a notification statute instead, is not sufficient to defeat legislation absent a determination that the less restrictive action would effectively achieve the state's compelling interests. Indeed, the least restrictive action that a state may take in every case is not to legislate at all.

In *Treacy v. Municipality of Anchorage*,[84] in upholding the constitutionality of an Anchorage curfew law imposed on minors under age eighteen, we found proposed "less restrictive" alternatives to be unavailing because they were not effective in meeting the municipality's compelling interests.[85] Alternatives to the PCA which are less restrictive are therefore not bars to the constitutionality of the legislation *unless such alternatives are effective* in meeting the state's compelling interests.

(A) entered the armed services of the United States;
(B) become employed and self-subsisting;
(C) been emancipated under AS 09.55.590; or
(D) otherwise become independent from the care and control of the woman's parent, guardian, or custodian.

80. AS 18.16.090(2)(A).

81. MD.CODE ANN., HEALTH-GEN. § 20–103 (no exception for emancipated minors); KAN. STAT. ANN. § 65–6705 (2006) (no exception for unemancipated minors living independently); MINN.STAT. § 144.343 (same); MONT.CODE ANN. §§ 50–20–201 to 215 (same); NEB.REV STAT. §§ 71–6901 to 6908 (same); S.D. CODIFIED LAWS § 34–23A–7 (same); TEX. FAM.CODE ANN. §§ 33.001 to 011 (same); W. VA.CODE §§ 16–2F–1 to 9 (same).

82. 35 P.3d at 51–52 (Matthews, C.J., dissenting) (citing to *Bellotti*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979)) (noting that (1) proceedings must except minor from any parental consent requirements if minor can establish she is mature enough to make abortion decision, or that requiring consent is not in her best interests and (2) proceedings must be completed with anonymity and sufficient expedition).

83. AS 18.16.030(j).

84. 91 P.3d 252 (Alaska 2004).

85. *Id.* at 267.

Today's opinion repeatedly proffers the alternative of parental notification rather than parental consent, (an approach followed by only fifteen state legislatures [86] in comparison to the twenty-six state legislatures [87] that have adopted consent statutes [88]).

But every one of these parental notification statutes that lacks exceptions for seventeen-year-olds and other mature minors is *more* restrictive than Alaska's PCA.[89] More importantly, such parental notification statutes fail to achieve the same goals as consent laws, as discussed below.

The majority enthusiastically adopts the notion that a notice statute is less restrictive than the PCA because it does not give parents a "veto power." But as shown above, the PCA does not create a veto power because it includes a judicial bypass provision. Moreover, the United States Supreme Court has upheld a parental consent statute containing a judicial bypass procedure but fewer statutory exceptions than those included in Alaska's PCA.[90] Indeed, as Justice Matthews noted in *Planned Parenthood I*, "[c]urrently it appears that all members of the United States Supreme Court believe that a judicial authorization procedure that meets the conditions of the second *Bellotti* case"—as the PCA does—"is constitutional." [91]  In *Akron II*, which today's opinion cites to support its conclusion that notice statutes are less restrictive than consent statutes, the Court limited its distinction between consent and notification statutes to the central requirement that "in order to prevent another person from having an absolute veto power over a minor's decision to have an abortion, a State must provide some sort of bypass procedure if it elects to require parental consent." [92] The PCA provides such a procedure: judicial bypass.

Indeed, notification laws may present the worst case scenario by posing all the risks of privacy infringements of a consent/bypass statute with fewer of its mitigating effects. What could be further from the productive and supportive conversation that a consent statute aims to produce than the cold reality of parents receiving (perhaps after the abortion) a note in the mail informing them of their daughter's pregnancy and decision to abort?  It is certainly reasonable for a legis-

---

**86.** Colo Rev Stat. Ann. §§ 12–37.5–101 to 107 (West 2007); Del.Code Ann. tit. 24, §§ 1780 to 1789B; Fla. Stat. § 390.01114 (West 2007); Ga. Code Ann. §§ 15–11–110 to 118 (West 2007); 750 Ill. Comp. Stat.Ann. 70/1 to 99 (West 2007); Iowa Code Ann. § 135L.3 (West 2007); Kan. Stat. Ann. §§ 65–6701 to 6709; Md.Code Ann., Health–Gen. § 20–103; Minn.Stat. § 144.343; Mont.Code Ann. §§ 50–20–201 to 215; Neb.Rev.Stat. §§ 71–6901 to 6908; Nev.Rev.Stat. 442.255; N.J. Stat. Ann. § 9:17A–1.1 to 1.12 (West 2007); S.D. Codified Laws § 34–23A–7; W. Va.Code §§ 16–2F–1 to 9 (2006). Oklahoma, Texas, and Utah, not counted here, require both notification and consent. Okla. Stat. Ann. tit. 63, § 1–740.2 (West 2006); Tex. Fam.Code Ann. §§ 33.001 to .011; Tex. Occ. Code Ann. § 164.052(a)(19); Utah Code Ann. §§ 76–7–304, 76–7–304.5 (West 2006).

**87.** Ala.Code §§ 26–21–1 to 8 (1992); Ariz.Rev Stat. Ann. § 36–2152 (2006); Ark.Code Ann. §§ 20–16–801 to 810 (West 2006); Cal. Health & Safety Code § 123450 (West 2007); Idaho Code Ann. § 18–609A (West 2007); Ind.Code § 16–34–2–4 (West 2006); Ky.Rev.Stat. Ann. §§ 311.720, 311.732 (West 2006); La. Stat. Ann. § 40:1299.35.5 (2006); Me.Rev Stat. Ann. tit. 22, § 1597–A (2006); Mass. Gen. Laws ch. 112, § 12S (2004); Mich. Comp. Laws Ann. §§ 722.901 to 722.909 (West 2006); Miss Code Ann. § 41–41–53 (West 2006); Mo. Ann. Stat. § 188.028 (West 2006); N.C. Gen.Stat. Ann. §§ 90–21.6 to 90.21.10 (West 2006); N.D. Cent.Code § 14–02.1 to 03.1 (2005); Ohio Rev.Code Ann § 2919.121 (West 2006); Okla. Stat Ann. tit. 63, § 1–740.2 (West 2006); 18 Pa. Cons Stat. Ann. § 3206 (West 2006); R.I. Gen. Laws § 23–4.7–6 (2006); S.C. Code Ann. § 44–41–31 (2006); Tenn.Code Ann. §§ 37–10–301 to 308 (2005); Tex. Fam.Code Ann. §§ 33.001 to .011; Tex. Occ.Code Ann. § 164.052(a)(19); Utah Code Ann. §§ 76–7–304, 76–7–304.5; Va.Code Ann. § 16.1–241(V) (West 2006); Wis. Stat. Ann. § 48.375 (West 2005); Wyo. Stat. Ann. § 35–6–118 (2006).

**88.** Three states, Oklahoma, Texas, and Utah, have adopted both consent and notification statutes.

**89.** *See Treacy*, 91 P.3d at 267.

**90.** *See Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493–94, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983).

**91.** 35 P.3d at 51 (Matthews, J., dissenting).  It should be noted that since those words were written, Chief Justice John Roberts and Justice Samuel Alito have replaced Chief Justice William Rehnquist and Justice Sandra Day O'Connor.

**92.** 497 U.S. 502, 510–11, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

lature to conclude that consent statutes are more likely to foster actual conversations and parental involvement rather than the one-way, limited flow of information called for in notification statutes. Thus, the existence of notification statutes in a minority of states should not lead to invalidation of Alaska's consent statute unless it is clear that a notification statute would further the state's compelling interests.

3. **The legislature could reasonably conclude that "parental notification" statutes are not effective in protecting a pregnant girl against her own immaturity or in protecting her parents' right and duty to aid in her upbringing.**

Despite today's Opinion's rosy assertion that "all [notification statutes] prohibit minors from terminating a pregnancy until their parents have been notified and afforded an appropriate period of time to actively involve themselves in their minor children's decision-making processes," [93] it is truly questionable whether many notification statutes accomplish *anything* in the way of meaningful parental notification. Many do not even require that a parent be notified.

Thus, Delaware, identified by the majority opinion as a "notification" state, allows notification of a licensed mental health professional to substitute for parental notification. [94] Maryland, ostensibly another "notification" state, allows the physician performing the abortion to dispense with notification to the child's parent if in the physician's judgment the child is mature and capable of giving informed consent or if notification would not be in her best interests. [95] West Virginia, another "notification" state, allows the physi-

cian performing the abortion to dispense with notification if another doctor finds the child mature enough to make the decision for herself or that notification would not be in her best interests. [96] In all states the "waiting period" is so short that in many instances it will be largely meaningless. [97] Can it really be said that a requirement that written notification be sent to a child's parent, along with the presumption that "notice is effective upon mailing" and no waiting period (*e.g.*, Maryland [98]) or a twenty-four hour waiting period (*e.g.*, West Virginia with actual notice [99]) or even a forty-eight hour waiting period (*e.g.*, West Virginia with constructive notice [100]), would in any way further the state's interest in protecting the child against her immaturity and lack of judgment or protect the parents' role in helping to raise their child? It often will be, in truth, little more than a note sent into the night.

The court asserts that the state's compelling interests (it refers to them only as "legislative goals") "are no less likely to accompany parental notification than parental 'veto power.'" [101] Of course, as we have seen, there is no veto power in the PCA. But more importantly, only wishful thinking supports that conclusion. How can a statute that does not even require that parents be notified—as in Delaware, which allows notification of a mental health professional—"enhance the potential for parental consultation"? Or a statute that deems notice to be effective upon mailing and requires no waiting period or only a twenty-four hour waiting period? The court optimistically talks of "giving [parents] notice and time to consult with and guide their daughters through this important decision," [102] but this is not what notification statutes do. The longest waiting

93. Opinion at 583.

94. Del.Code. Ann. tit. 24 § 1783(a).

95. Md.Code Ann., Health-Gen. § 20–103(c)(1)(ii), (iii).

96. W. Va Code § 16–2F–3(c).

97. The waiting periods range between twenty-four hours (Delaware, West Virginia (twenty-four hours after actual notice), Georgia, Kansas, and Utah) and forty-eight hours (West Virginia (forty-

eight hours after mailing notice), Iowa, Colorado, Illinois, Minnesota, Nebraska, South Dakota, Texas, Montana).

98. Md.Code. Ann., Health-Gen. § 20–103.

99. W. Va Code. § 16–2F–3(a).

100. *Id.*

101. Opinion at 585.

102. *Id.* at 584.

period in any current notification statute—measured from the time of mailing of the notice—is seventy-two hours.[103] Most are substantially shorter.[104] Under these circumstances, to conclude, as today's Opinion does, that a notification statute provides a better chance than a consent statute that parents will "engage in a constructive and ongoing conversation with their minor children about the important medical, philosophical, and moral issues surrounding abortion"[105] is truly wishful thinking. At least under a consent statute, where the child opts not to seek judicial bypass, there must be a conversation. Under a notification statute, where the child opts not to seek judicial bypass, there is only a mailing. There is little reason to believe that notification statutes are effective in protecting minors from their own immaturity or effective in protecting parents' rights (and duties) to help their children negotiate the difficult path to adulthood.

We should heed our admonition in *Treacy*: In analyzing the argument that a legislative solution is not the "least restrictive" one, courts must take care to require the challenger to demonstrate that the supposedly less restrictive alternative is actually effective in protecting the state's (and parents') compelling interests. The court today fails to show that a notification statute "will

achieve the State's compelling interests." This is because, as we have seen, notification laws are ineffective in so many ways in protecting children from their immaturity and in protecting parents' rights and obligations to guide their children's upbringing. And today's opinion declines even to say whether a parental notification approach would be constitutional.

## IV.  Conclusion

The Alaska Legislature carefully balanced the constitutional right of an underage pregnant girl to privacy and the state's compelling interests in protecting children against their own immaturity and protecting parents' constitutional right (and duty) to guide their children to maturity. Because the PCA is the least restrictive alternative which will effectively advance the state's compelling interests while protecting the child's constitutional right, we should hold that the superior court erred in invalidating it. I respectfully dissent.

---

**103.**  *See* Ga.Code Ann. § 15–11–112(a) (written notice deemed delivered forty-eight hours after mailing; abortion may be performed twenty-fours hours after).

**104.**  *See, e.g.,* Del.Code Ann. tit. 24 § 1783; Ga. Code Ann. § 15–11–112(a)(1)(B); Utah Code Ann.

§ 76–7–304(3);  W. Va.Code Ann. § 16–25–3(a) (all requiring a waiting period of only twenty-four hours).

**105.**  Opinion at 585.