**Jack L. BELTZ, Petitioner,**

v.

**STATE of Alaska, Respondent.**

No. S–12775.

Supreme Court of Alaska.

Dec. 18, 2009.

Rehearing Denied Jan. 8, 2010.

A. Lee Petersen, Petersen Professional Corp., Willow, for Petitioner.

Terisia K. Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

The question presented here is whether police officers violated Jack Beltz's right to be free from unreasonable searches and seizures when, without a warrant, they seized and searched garbage he had set out on public property for collection. The superior court held that they did and suppressed the evidentiary fruits of the search. The court of appeals reversed, holding that the search did not violate the federal and state constitutions. Beltz appeals. He argues primarily that the court of appeals incorrectly applied the current standard for analyzing garbage searches under the Alaska Constitution, and argues alternatively that we should adopt a more protective standard. We affirm the result reached by the court of appeals. We hold that, under the Alaska Constitution, some expectation of privacy in garbage set out for routine collection on or adjacent to a public street (or a public area) is objectively reasonable, but that in this case the police officers' reasonable suspicion that Beltz was manufacturing methamphetamine was sufficient to justify their warrantless seizure and search of his garbage.

## II. FACTS AND PROCEEDINGS

In October 2004 employees of a Carrs grocery store in Wasilla reported to police that an adult male had purchased numerous quantities of items commonly used to make methamphetamine. The police obtained receipts for thirteen boxes of matches and three boxes of Sudafed that had been purchased using a Carrs Club card registered to Jack Beltz's father. The police recognized the employees' description of the buyer as that of Jack Beltz, and, according to the police log and affidavits, "on or about" October 21 two of the three grocery store employees identified Jack Beltz from a photo lineup.

At around two a.m. on October 21, 2004, police officers drove to the single-family

home where Jack Beltz lived with his father.[1] A driveway approximately thirty or more feet long ran from the street to the home. At the street end of the driveway, there were two lidded garbage cans inside a wheeled cart with three wooden sides; a bungee cord secured the fourth side. Beltz had set the containers out, apparently at around ten or eleven that evening, so they could be emptied by trash collectors early the next morning. The parties disputed whether this garbage was on the Beltzes' property or on public property; the superior court found by a preponderance of the evidence that it was on public property, but recognized that the location likely "appeared" to be part of the Beltzes' private property.

The officers removed one or two garbage bags that were in or around the cans. The officers left the area, taking the seized bags with them, when they saw lights turn off inside the house. After the officers left, Beltz put a new bag of garbage in a now-empty can. He later testified that he had seen someone take his garbage bags that night. When the police examined the contents of the bags they found evidence of methamphetamine manufacturing.[2]

The officers returned at around seven-thirty a.m., having arranged for one officer to ride along with the regular garbage collector to pick up the rest of Beltz's trash and keep it separate from other people's trash. The police took this garbage back to their office and found in it additional household items commonly used to manufacture methamphetamine. Over the next several weeks officers worked with the trash collectors in the same way to take additional garbage from Beltz's house, but found no additional methamphetamine-related items.

Apparently based in part on evidence from the October 21 garbage search, officers obtained a warrant to search Beltz's home in December 2004. No incriminating evidence was found in the home, but Beltz made several incriminating statements in an interview conducted during the search. According to an officer's summary of the interview, Beltz admitted that: he had purchased items that he knew would be used to manufacture methamphetamine; he bought the items for three people who paid him to do so, and once allowed one of them to "cook" methamphetamine at his house; when that person left the house, Beltz cleaned up and put everything in the trash; and he cut off all association with those three people after seeing someone take his garbage in October.

In May 2005 a grand jury indicted Beltz on three counts of second-degree misconduct involving a controlled substance and one count of fourth-degree misconduct involving a controlled substance.[3] Beltz moved to suppress all evidence obtained as a result of the garbage search. The superior court held an evidentiary hearing at which Beltz, his father, and several police officers testified. At the conclusion of the hearing the court granted the motion to suppress. The state filed a petition for review with the court of appeals, which reversed the superior court's decision.[4]

Beltz filed a petition for hearing with this court, arguing that the removal and examination of his garbage was an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and article I, section 14 of the Alaska Constitution. After hearing oral argument, we requested supplemental briefs on whether we should adopt a reasonable suspicion standard for warrantless garbage searches, and whether reasonable suspicion supported the

---

1. There appears to be some immaterial inconsistency in the chronology of events. Because it is apparently undisputed that the identification occurred shortly before the seizure, and that the seizure took place at two a.m. on October 21, it seems unlikely that the Carrs employees identified Beltz on October 21.

2. The items found in these two bags and the bags seized later that morning included "eleven bottles or plastic containers with liquid or solid methamphetamine lab waste and byproduct, one empty container of Coleman fuel, one empty

acetone can, hundreds of matchbook covers with the striker plates removed, seven empty containers of HEET, twelve empty bottles of cold allergy tablets, stained coffee filters, stained tubing, and stained latex gloves." *State v. Beltz*, 160 P.3d 154, 156 (Alaska App.2007).

3. AS 11.71.020(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

4. *Beltz*, 160 P.3d at 156.

search in this case. Both Beltz and the state argue in their supplemental briefs against adopting a reasonable suspicion standard; the parties disagree about whether the police had reasonable suspicion to conduct this search.

## III. STANDARD OF REVIEW

■■■ Whether a defendant had a subjective expectation of privacy is a question of fact, and we review the superior court's finding on the issue for clear error.[5] A finding of fact is clearly erroneous if a review of the record leaves us with a definite and firm conviction that a mistake has been made.[6] Whether the subjective expectation of privacy was objectively reasonable is a question of law that we review de novo.[7]

■■■ Whether to adopt a new constitutional standard is a question of law.[8] We review constitutional questions de novo, adopting the rule that is most persuasive in light of precedent, reason, and policy.[9]

## IV. DISCUSSION

### A. Did the Search of Beltz's Garbage Violate His Federal Constitutional Right To Be Free from Unreasonable Searches and Seizures?

■■ Beltz appears to argue that the search of his garbage violated his right to be free from unreasonable searches and seizures

under the Fourth Amendment of the United States Constitution.[10] But in a factually similar case the United States Supreme Court held to the contrary. In *California v. Greenwood* the Court held that police did not need a warrant to search garbage the defendants had placed on the curb or street in front of their house for routine garbage collection.[11] The Court based its analysis on Justice Harlan's concurring opinion in *Katz v. United States*,[12] and reasoned that the Fourth Amendment's warrant requirement would apply only if the defendant had a subjective expectation of privacy in the garbage and if society accepted that expectation as objectively reasonable.[13] The Court concluded that any subjective expectation of privacy the defendants had in garbage "left for collection in an area accessible to the public" or "at the side of a public street" was not reasonable.[14]

The superior court found that Beltz placed his garbage on public property at the end of his driveway near the street so it could be picked up by garbage collectors. *Greenwood* controls Beltz's federal constitutional claim. The search and seizure of Beltz's garbage did not violate the Fourth Amendment.

### B. Did the Search of Beltz's Garbage Violate His Alaska Constitutional Right To Be Free from Unreasonable Searches and Seizures?

For convenience we characterize the police conduct in this case as a search, although the police first seized the bags, and then searched them at a different location.

---

**5.** *Pearce v. State*, 45 P.3d 679, 682 (Alaska App. 2002).

**6.** *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1120 (Alaska 2002).

**7.** *Pearce*, 45 P.3d at 682.

**8.** *Nevers v. State, Dep't of Admin.*, 123 P.3d 958, 961 (Alaska 2005).

**9.** *Id.* at 961.

**10.** U.S. Const. amend. IV. This amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**11.** *California v. Greenwood*, 486 U.S. 35, 37, 39–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

**12.** *Katz v. United States*, 389 U.S. 347, 360–62, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

**13.** *Greenwood*, 486 U.S. at 39, 108 S.Ct. 1625 ("The warrantless search and seizure of the garbage bags left at the curb outside the Greenwood house would violate the Fourth Amendment only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable.") (citing *Katz*, 389 U.S. at 361, 88 S.Ct. 507).

**14.** *Id.* at 41, 43–44, 108 S.Ct. 1625.

In 1973 we held in *Smith v. State* [15] that a warrantless search of garbage bags the defendant had placed in a dumpster outside, but on the property of, her apartment building did not violate article I, section 14 of the Alaska Constitution.[16] The state argues, and the court of appeals held, that the search of Beltz's garbage was permissible under *Smith*.[17] Beltz argues that the court of appeals incorrectly applied *Smith*, and argues alternatively that we should adopt a standard that is more protective of privacy rights and the right to be free from unreasonable searches and seizures.

As the Supreme Court was to do later in *Greenwood*,[18] we based our analysis in *Smith* on Justice Harlan's concurring opinion in *Katz* and adopted his proposed two-prong test for deciding whether a warrant was required.[19] The parties in the present case disagree about the outcome under each prong of this standard: whether the defendant had a subjective expectation of privacy, and whether that subjective expectation was objectively reasonable. Beltz argues that he subjectively expected his trash to remain private,[20] and that his subjective expectation was objectively reasonable. The state argues that Beltz did not expect his trash to remain private and that any subjective expectation of privacy he had in his trash would have been objectively unreasonable.

The state also argues that this case is not yet ripe for review because the superior court did not explicitly find that Beltz had a subjective expectation of privacy. Beltz contends that the superior court did find that he had that expectation, but that it did so implicitly, rather than explicitly. He reasons that the superior court would not have addressed the reasonableness question unless it had first implicitly found that Beltz had a subjective expectation of privacy.

We assume, without deciding, that the superior court implicitly found that Beltz had a subjective expectation of privacy, and that this implicit finding was both sufficient and not clearly erroneous.[21] We instead focus on whether any subjective expectation of privacy Beltz had in the garbage was objectively reasonable.

### 1. Was Beltz's expectation of privacy objectively reasonable?

The state argues that any subjective expectation of privacy Beltz had in his garbage was not objectively reasonable under the standard we articulated in *Smith v. State*.[22] Beltz argues that his expectation was reasonable under *Smith* and, alternatively, that we should adopt a more rigorous standard. The superior court and court of appeals were constrained to apply *Smith*. The court of appeals reversed the superior court's holding that Beltz's expectation of privacy was reasonable under the *Smith* standard.[23]

---

15. *Smith v. State*, 510 P.2d 793 (Alaska 1973).

16. *Id.* at 797. Article I, section 14 of the Alaska Constitution provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

17. *State v. Beltz*, 160 P.3d 154, 160–61 (Alaska App.2007).

18. *Greenwood*, 486 U.S. at 39, 108 S.Ct. 1625.

19. *Smith*, 510 P.2d at 797.

20. Beltz lists the evidence that he argues demonstrates that he had a subjective expectation of privacy: he testified that he thought the trash was on his property, even though the superior court found that it was on public property; he stated in an affidavit that he took the garbage outside at ten or eleven p.m., expecting it to be outside for only a short time before being picked up by the garbage collectors; he also stated in his affidavit that he expected the trash collectors to mix his trash with other people's garbage, which he claims would have kept his trash private; and there was evidence that at least some of the garbage taken by the police had been in a lidded bin inside the cart, and that the lid, bin, and cart belonged to the Beltz household.

21. *See Pearce v. State*, 45 P.3d 679, 682 (Alaska App.2002).

22. *Smith*, 510 P.2d at 797–98.

23. *State v. Beltz*, 160 P.3d 154, 156, 159–60 (Alaska App.2007).

■ In *Smith* we adopted the two-prong analysis proposed in Justice Harlan's concurrence in *Katz*, and listed four factors that could be used to determine whether a person's subjective expectation of privacy in his trash was objectively reasonable: (1) where the trash was located, (2) whether the dwelling was multiple or single unit, (3) who removed the trash, and (4) where the search of the trash took place.[24] We explicitly limited our holding in *Smith* to the "particular facts of the case at bar."[25]

Beltz urges us to replace the *Smith* factors with the standard Chief Justice Rabinowitz proposed in his dissent in *Smith*.[26] Under that standard, courts would determine whether an expectation of privacy in garbage was objectively reasonable by examining "[the defendant's] behavior . . . to determine whether or not she intended to knowingly disclose to the public, publicly communicate, or publicize the contents of her garbage."[27] If the answer is "no," the defendant has a constitutionally protected privacy interest, and a warrant is required to search the garbage. The dissenting opinion would adopt that standard.[28] But carried to its logical conclusion, that standard would seem to foreclose warrantless searches of garbage even after the garbage bags have reached a landfill, and probably even after they have been long buried. Those examples illustrate that application of that standard ultimately turns on the defendant's subjective expectations, and effectively ignores the objective reasonableness of those expectations.

The parties' arguments present us with two irreconcilable choices: either (1) requiring a warrant for garbage searches, on a theory there is a reasonable expectation of privacy in one's garbage after it has been set out on or adjacent to a public street (or a public area) for collection or, possibly, even after it has been collected, or (2) holding that no expectation of privacy in garbage set out for collection on or adjacent to a public street (or a public area) is reasonable, and that police therefore do not need a warrant or any cause to search it. Both choices fail to recognize the subtle balancing inherent in deciding the extent to which society is willing to recognize an expectation of privacy as reasonable. We decline to adopt either of these approaches.

In so doing, we affirm *Smith's* adoption of the two-prong *Katz* analysis, and note that the *Smith* factors, which are not the exclusive considerations that affect whether an expectation of privacy is reasonable, may still be relevant to searches of garbage not set out on or adjacent to a public street or a public area. Moreover, we acknowledge that the explicit protection of privacy set out in article I, section 22 of the Alaska Constitution necessarily modifies *Smith* and increases the likelihood that a person's expectation of privacy in garbage can be deemed objectively reasonable.[29]

Although *Smith* was decided in 1973, it arose in 1970 and the appellate briefs were submitted in that case before Alaska voters amended the state constitution in August 1972 to adopt the privacy amendment.[30] In analyzing Smith's suppression argument, our opinion addressed only article I, section 14 (the right to be free from unreasonable searches and seizures), the sole Alaska constitutional provision raised by the parties.[31]

---

24. *Smith*, 510 P.2d at 797–98.

25. *Id.* at 795.

26. *Id.* at 801, 803 (Rabinowitz, C.J., dissenting). One of the leading commentators on search and seizure law has expressed support for the standard proposed by Chief Justice Rabinowitz. 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.6(c), at 692–93, 696, 701–02 (4th ed.2004) (quoting extensively from Chief Justice Rabinowitz's dissent and submitting that *Smith* was incorrectly decided).

27. *Smith*, 510 P.2d at 803 (Rabinowitz, C.J., dissenting).

28. Op. at 339-40.

29. Article I, section 22 of the Alaska Constitution provides in relevant part: "The right of the people to privacy is recognized and shall not be infringed."

30. Alaska Const. art. I, § 22.

31. *Smith*, 510 P.2d at 794. Unlike the majority opinion, Chief Justice Rabinowitz's dissent addressed article I, section 22. *Id.* at 799 (Rabinowitz, C.J., dissenting).

The explicit privacy protection now contained in our constitution necessarily affects how the two-prong *Katz* analysis applies to garbage searches: a defendant's privacy interest in garbage is entitled to greater protection than we recognized, or needed to recognize, in *Smith.*

Since deciding *Smith,* we have recognized that "[b]ecause this right to privacy is explicit, its protections are necessarily more robust and 'broader in scope' than those of the implied federal right to privacy" [32] and have held that "where a search is alleged to be unconstitutional, section 14's standards for a proper search and seizure are 'inexorably entwined' with section 22's privacy protections." [33] We have invoked the privacy amendment in opinions: barring the state from surreptitiously recording conversations in certain circumstances; [34] prohibiting warrantless administrative inspections of certain business premises; [35] and preventing police from opening closed luggage during an inventory search of a vehicle.[36] In each of these cases the privacy amendment affected our analysis of search and seizure protections, as it must here.

■ As the court of appeals stated in its decision below, "courts have recognized that, with the advance of technology, the police can learn a great deal about a person's life and associations [by searching garbage], including even obtaining DNA for testing and for investigation." [37] Based on article I, sections 14 and 22, and the highly personal information that can be revealed by a garbage search, we hold that a person who sets out garbage for routine collection on or adjacent to a public street (or a public area) has some objectively reasonable expectation of privacy in that garbage.[38]

## 2. Was the search "unreasonable"?

Holding that Beltz had some objectively reasonable expectation of privacy in his garbage does not resolve the questions before us. We must still decide whether the search was "unreasonable" under the Alaska Constitution.

### a. The reasonable suspicion standard

■ We have consistently held that a warrantless search is per se unreasonable unless exigent circumstances exist or another of the limited exceptions to the warrant requirement applies.[39] But a person's expectation of privacy in garbage set out on or

32. *State v. Planned Parenthood of Alaska,* 171 P.3d 577, 581 (Alaska 2007); *see also Myers v. Alaska Psychiatric Inst.,* 138 P.3d 238, 245 (Alaska 2006) ("'We have specifically recognized that Alaska's guarantee of privacy is broader than the federal constitution's: 'Since the citizens of Alaska, with their strong emphasis on individual liberty, enacted an amendment to the Alaska Constitution expressly providing for a right to privacy not found in the United States Constitution, it can only be concluded that the right is broader in scope than that of the Federal Constitution.' '') (quoting *Anchorage Police Dep't Employees Ass'n v. Municipality of Anchorage,* 24 P.3d 547, 550 (Alaska 2001)).

33. *Nevers v. State, Dep't of Admin.,* 123 P.3d 958, 962 n. 12 (Alaska 2005) (citing *Anchorage Police Dep't Employees Ass'n,* 24 P.3d at 550–51).

34. *State v. Glass,* 583 P.2d 872, 878–81 (Alaska 1978), *modified on other grounds,* 596 P.2d 10 (Alaska 1979).

35. *Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 148–51 (Alaska 1977).

36. *State v. Daniel,* 589 P.2d 408, 416 (Alaska 1979).

37. *State v. Beltz,* 160 P.3d 154, 160 (Alaska App. 2007) (citing *State v. Tanaka,* 67 Haw. 658, 701 P.2d 1274, 1276–77 (1985); *State v. A Blue in Color, 1993 Chevrolet Pickup,* 328 Mont. 10, 116 P.3d 800, 806–07 (2005) (Nelson, J., concurring); 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE. A TREATISE ON THE FOURTH AMENDMENT § 2.6(c), at 692 (4th ed.2004)); *see also State v. Hempele,* 120 N.J. 182, 576 A.2d 793, 802–03 (1990); *State v. Granville,* 140 N.M. 345, 142 P.3d 933, 941 (App. 2006).

38. We do not consider here whether any subjective expectation of privacy would be objectively reasonable after the garbage has actually been collected. We also do not decide whether a greater expectation of privacy would be objectively reasonable if trash were not set out for routine collection or were not left on or adjacent to a public street or a public area.

39. *Nevers v. State, Dep't of Admin.,* 123 P.3d 958, 962 (Alaska 2005); *see also Milton v. State,* 879 P.2d 1031, 1034 (Alaska App.1994); *Harrison v. State,* 860 P.2d 1280, 1283 (Alaska App.1993).

adjacent to a public street or a public area for collection does not merit the same level of protection as a person's expectation of privacy in, for example, his or her home or person. It is not objectively reasonable for a person to expect the same level of privacy in such garbage. The owner not only intends to expose the garbage to routine pickup, but also risks potential intrusions by intermeddling humans (even garbage collectors), and the possibility that animals, snow plows, and wind may reveal the contents of the garbage containers.[40]

■■■■■ As we held in *State v. Myers*,

Expectations of privacy are not all of the same intensity.... Both subjectively and in society's judgment as to what is reasonable, distinctions may be made in the varying degrees of privacy retained in different places and objects. When a police intrusion takes place in a context in which only a "diminished expectation of privacy" exists, such a search must be "reasonable" within the meaning of the Constitution, but may not necessarily be subject to the warrant requirement.[41]

Any expectation of privacy in garbage set out for routine street-side collection is diminished. That expectation therefore does not necessarily require the protections of a warrant before police can conduct a search, even given Alaska's explicit right to privacy.[42]

■■■■ Nonetheless, this diminished privacy interest is still entitled to some protection against undue government intrusion.[43] We conclude that it is consistent with the privacy amendment and the prohibition against unreasonable searches and seizures to allow a warrantless search of garbage set out on or adjacent to a public street for routine collection only if police have a reasonable suspicion that the garbage contains evidence of a serious crime.[44] Garbage sweeps, or searches of garbage not suspected to contain evidence of a serious crime, are not permissible.

■■■■ The reasonable suspicion standard is most often applied in the context of investigatory stop-and-frisks. Under certain circumstances, a police officer may, without a warrant, temporarily detain a person for questioning and pat down the person's clothing for the sole purpose of detecting weapons

40. *See California v. Greenwood,* 486 U.S. 35, 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (holding that there is no objectively reasonable expectation of privacy in garbage under federal constitution, and noting that "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public.").

41. *State v. Myers,* 601 P.2d 239, 242 (Alaska 1979) (internal citations omitted).

42. An argument might be made that warrantless searches of garbage set out on or adjacent to a public street for collection are permissible because the exigent circumstances exception to the warrant requirement applies. Under the exigent circumstances exception, a warrantless search may be justified by potential loss of evidence. *Finch v. State,* 592 P.2d 1196, 1198 (Alaska 1979); *Ingram v. State,* 703 P.2d 415, 422 (Alaska App.1985), *aff'd,* 719 P.2d 265 (Alaska 1986). The evidentiary value of garbage on the street awaiting collection is inherently at risk. Before its collection, the trash is susceptible to scavenging by humans and animals, potentially destroying or removing any evidence in the trash. After the trash is collected, the bags may break open and the contents may mix with other people's trash, making it far harder and perhaps impossible to link evidence to a particular defendant.

But we decline to base our decision on this reasoning. Determining whether exigent circumstances exist is a fact-specific inquiry. *City of Kodiak v. Samaniego,* 83 P.3d 1077, 1084 (Alaska 2004). It requires "balancing the nature of the exigency against the degree of intrusiveness of the warrantless search or seizure." *Ingram,* 703 P.2d at 422. Instead of requiring this fact-specific balancing for every garbage search, we base our decision on the diminished expectation of privacy a person has in his or her garbage.

43. *See, e.g., Sprague v. State,* 590 P.2d 410, 417 (Alaska 1979) (holding that although probationers and parolees have diminished expectations of privacy, warrantless searches of their residences are only permissible under certain limited circumstances).

44. *See Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976) (allowing a warrantless investigatory stop in cases "where the police officer has reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred"); *see also Ebona v. State,* 577 P.2d 698, 700 (Alaska 1978) (describing the "Alaska rule" as "permitting a temporary stop when the officer has a reasonable suspicion that imminent public danger exists, or serious harm to persons or property has recently occurred").

or other contraband.[45] "In Alaska, a police officer may make an investigatory stop if the officer has 'a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred.'"[46] An officer has a reasonable suspicion if "the totality of the circumstances indicates that there is a substantial *possibility* that conduct giving rise to a public danger has occurred, is occurring, or is about to occur."[47] This same standard applies by analogy to garbage searches: a warrantless search of garbage set out on or adjacent to a public street for collection is permissible only if the totality of the circumstances indicates that there is a substantial possibility that imminent public danger exists or that conduct giving rise to serious harm to persons or property has recently occurred, is occurring, or is about to occur.

> In the investigatory stop context, we recently noted that [i]n evaluating whether a specific stop was legal, Alaska courts apply a balancing test. . . . The degree of threat to the public safety and the imminence of that threat (or the seriousness of an already committed crime and the recency of the crime)[ ] must be weighed against the strength of the officer's reasonable suspicion and the intrusiveness of the stop.[48]

This test is an expression of the broader principle that if a search (or seizure) is minimally invasive of privacy, the reasonableness of the search is determined by balancing the need to search against the invasion that the search entails.[49]

■■■ We recognize that our investigatory stop jurisprudence is not perfectly transferable to the garbage search context. The government's need for imminent action in garbage searches may be different from that in the stop-and-frisk context. The temporal urgency associated with a garbage search may be lower than in most investigatory stop situations, in which an officer needs to question a person who may be leaving the scene. Therefore, although we choose to apply the same test, the imminence of the need to investigate may entail less urgent risk to public safety, or less immediate need to act to stop a crime, than in the stop-and-frisk context. Although the threatened disappearance of evidence of a serious crime is not generally enough for a warrantless search absent exigent circumstances and probable cause, a garbage search is a sufficiently minimal intrusion on privacy expectations to require only reasonable suspicion that the trash contains evidence of a crime causing serious harm to persons or property.

Here the record shows that police searched Beltz's trash after grocery store employees reported that Beltz had repeatedly purchased combinations of items commonly associated with manufacturing methamphetamine and that Beltz had used his father's Carrs Club card to buy three boxes of Sudafed and thirteen boxes of book matches. Beltz does not dispute that he purchased these items.

■■■ The evidence of Beltz's purchases was sufficient to create a reasonable suspicion that he was manufacturing methamphetamine, and we agree with the state's argument that the police reasonably believed that the manufacturing would occur at Beltz's home and that evidence of the manufacturing would be found in the garbage.[50] Manufac-

---

45. *See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 376–77, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976).

46. *Hartman v. State, Dep't of Admin., Div. of Motor Vehicles,* 152 P.3d 1118, 1122 (Alaska 2007) (citing *Coleman,* 553 P.2d at 46).

47. *Id.* at 1122 (emphasis in original) (internal quotation marks omitted) (quoting *Saltz v. State, Dep't of Admin., Div. of Motor Vehicles,* 126 P.3d 133, 136 (Alaska 2005)).

48. *State v. Miller,* 207 P.3d 541, 544 (Alaska 2009).

49. *See Coleman,* 553 P.2d at 43–47; *see also Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *State v. Myers,* 601 P.2d 239, 243–44 (Alaska 1979).

50. The dissenting opinion expresses concern that Beltz's father may have been subjected to an unreasonable search and seizure because the police did not have specific information about who actually produced the garbage, who placed the garbage in the seized bags, or who placed the garbage bags in and on the garbage bins. Op. at 342. The situation here is comparable to a po-

turing methamphetamine creates an imminent danger to the public and gives rise to serious harm to persons or property. As the state contends, the process of manufacturing methamphetamine can harm people and property through fire, explosion, and chemical residue. Because the officers' suspicion was based on evidence that is undisputed, we do not need to remand to the superior court for further factual findings to determine whether reasonable suspicion justified this search.[51]

### b. The *Litchfield* requirements

In addition to requiring that a warrantless garbage search be based on reasonable suspicion, we impose two further limitations introduced by the Indiana Supreme Court in a factually similar case, *Litchfield v. State*.[52] The court in *Litchfield* held that in order for a warrantless search of garbage to be reasonable, the "trash must be retrieved in substantially the same manner as the trash collector would take it" and "police ... need to ensure that they do not cause a disturbance or create the appearance of a police raid of the residence."[53] Here, the police removed the first two bags of Beltz's trash in much the same way trash collectors would have removed them, and the later bags were actually removed by trash collectors. Furthermore, the police caused no disturbance; they searched the bags away from his home instead of rummaging through them on the street.[54]

Additional factors weigh in favor of holding that the search in this case was reasonable. The suspicion of methamphetamine manufacture was not a pretext for a search for evidence of an unrelated crime. The seizure was of garbage left for collection on or adjacent to a public street and did not involve a police trespass into the curtilage of Beltz's house. And the search involved property that Beltz had essentially abandoned and expected to be taken by trash collectors with-

---

lice search of a home occupied by multiple residents: when police search for evidence against one resident, they are permitted to search common areas and to seize evidence in plain view, even if the item belongs to someone other than that resident. *See Reeves v. State*, 599 P.2d 727, 739 (Alaska 1979) (stating that officer may seize evidence seen from place where officer was legally entitled to be if certain conditions are met); *Milton v. State*, 879 P.2d 1031, 1035 (Alaska App.1994) ("In the case of a shared residence, the probation officer's search may extend to all areas of the residence over which the probationer has control, even if that control is not exclusive. This includes common areas of the residence.").

We express no opinion about whether reasonable suspicion as to one resident of an apartment building would justify a search of the entire building's garbage left on or near the street for collection.

51. We note that after the initial garbage search, the police continued to search Beltz's garbage for several weeks. No further incriminating evidence was found in these subsequent searches. We do not decide here what would have happened if, after the first incriminating evidence was found, police failed to secure a warrant when they had ample time to do so before conducting later searches that produced additional incriminating evidence.

52. *Litchfield v. State*, 824 N.E.2d 356, 363–64 (Ind.2005).

53. *Id.* at 363–64; *see also State v. A Blue in Color, 1993 Chevrolet Pickup*, 328 Mont. 10, 116 P.3d 800, 802–03, 805 (2005) (adopting *Litchfield's* limitations on warrantless garbage searches).

The courts in both *Litchfield* and *A Blue in Color, 1993 Chevrolet Pickup* adopted a reasonable suspicion requirement for garbage searches, but their analyses differed from our own. The Indiana Constitution does not contain an express privacy protection and the court did not apply the two-prong *Katz* analysis, which had previously been rejected in Indiana. *Litchfield*, 824 N.E.2d at 359. The court instead evaluated the reasonableness of the search under the "totality of the circumstances." *Id.* Despite these differences, the opinion's discussion is a persuasive and practical resolution of the dispute under the circumstances presented.

The Montana Supreme Court applied a *Katz*-like analysis but determined that there was no objectively reasonable expectation of privacy in the garbage, despite the state constitution's express privacy protection. *A Blue in Color, 1993 Chevrolet Pickup*, 116 P.3d at 802.

54. *See A Blue in Color, 1993 Chevrolet Pickup*, 116 P.3d at 805 ("[O]fficers cannot openly rummage through a person's garbage at the curb or in the alley, to the embarrassment or indignity of the owner."). In some cases moving an item to a different location before searching it could make a search less, instead of more, reasonable. In holding that this factor makes the search more reasonable in this case we do not imply that the same would be true in all situations.

in hours. Although these last two factors may seem to invoke property law concepts that appear irrelevant to the constitutional question presented here, we are not denigrating the right to privacy by treating it as though it is merely a property right.[55] How someone treats his property can be relevant to whether he expects privacy, to what extent his right to privacy was affected, and to what extent his expectation should be protected.[56]

Based on these considerations, we hold that the search of Beltz's garbage was reasonable, and did not violate Beltz's right to be free from unreasonable searches and seizures under the Alaska Constitution.

## V. CONCLUSION

We AFFIRM the court of appeals' decision that reversed the superior court's suppression of the evidentiary fruits of the garbage search, and REMAND for further proceedings.

WINFREE, Justice, dissenting.

### 1. Overview

I am unable to agree with the court's disposition of Jack Beltz's privacy claim under the Alaska Constitution. If our only choices for a rule about warrantless seizures and searches of garbage left for collection in the normal course were the federal rule or today's new Alaska rule, I would join the court's decision without hesitation. But our choices are not so limited. Although the rule adopted by the court lies somewhat closer to the protections embodied in the Alaska Constitution than the federal rule, its constitutional protections are mostly illusory. I would instead adopt the rule Chief Justice Rabinowitz advocated in his dissent in *Smith v. State*.[1]

As the court notes, *Smith v. State* was decided in 1973, but the case actually arose in 1970. The parties submitted appellate briefs before Alaska voters adopted article I, section 22 of the Alaska Constitution in 1972.[2] In his briefs Smith relied only on article I, section 14 of the Alaska Constitution.[3] Implicitly acknowledging that the addition of the article I, section 22 privacy clause would change the legal landscape, the *Smith* court: (1) expressly limited its holding to the specific facts of that case; (2) found no reason to interpret article I, section 14 of the state constitution more broadly than the federal constitution; and (3) declined "to announce a general rule sanctioning official gathering and analysis of an individual's refuse."[4] The court today aptly describes the subsequent effect of article I, section 22 on our article I, section 14 jurisprudence, demonstrating the wisdom of *Smith's* self-imposed limitations.

In my view *Smith* has no precedential value and neither controls nor contributes to the resolution of cases involving police seizures and searches of garbage placed for collection in the normal course.[5] Working with a clean slate, I would adopt Chief Justice Rabinowitz's approach in his *Smith* dis-

---

**55.** *See Smith v. State*, 510 P.2d 793, 801 (Alaska 1973) (Rabinowitz, C.J., dissenting) ("I find little utility in the majority's ... importation into the realm of constitutional analysis of 'traditional property law concepts' such as 'abandonment' and 'relinquishment of title, possession or claim to property.' In the case at bar, we are concerned with the determination of constitutional rights rather than ... property interests.").

**56.** As the dissenting opinion points out, municipal codes often specify where trash must be set out for collection. Op. at 340–41. Because we hold that garbage left out for collection on or adjacent to a public street is subject to a warrantless search for reasonable suspicion, it does not matter that municipal codes may vary in specifying precisely where the trash must be placed.

**1.** 510 P.2d 793, 799–805 (Alaska 1973) (Rabinowitz, C.J., dissenting).

**2.** Article I, section 22 of the Alaska Constitution provides in relevant part: "The right of the peo-

ple to privacy is recognized and shall not be infringed."

**3.** 510 P.2d at 794. Article I, section 14 of the Alaska Constitution provides:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**4.** 510 P.2d at 795.

**5.** I refer to "normal course" as the routine placement of household garbage, in closed bags or boxes or inside garbage cans, at curbside for collection, usually in accordance with local ordinances.

sent, which expressly took into account the new article I, section 22 of the Alaska Constitution: courts should look to an individual's behavior to determine objectively "whether the person has exhibited a reasonable expectation of privacy"[6] or instead has exhibited an intent "to knowingly disclose to the public, publicly communicate, or publicize the contents of her garbage" left for collection.[7] If the expectation of privacy is reasonable, it is protected by sections 14 and 22 of article I of the Alaska Constitution and may not be abrogated without a search warrant.[8]

Responding directly to some of the same arguments about diminished expectations of privacy that the court makes today, Chief Justice Rabinowitz referred to "differential expectations of privacy" and noted that "citizens might expect a few, infrequent invasions of their privacy interests by third persons, but might simultaneously expect their privacy to remain immune from governmental intrusions."[9] I agree. Chief Justice Rabinowitz asserted that "a free and open society cannot exist without the right of the people to be immune from unreasonable interference by representatives of their government."[10] I agree. Chief Justice Rabinowitz concluded that a warrantless seizure and search of household garbage left for collection falls within the category of unreasonable interference.[11] I agree.

Today the court correctly holds that under article I, sections 14 and 22 of the Alaska Constitution "a person who sets out garbage for routine collection on or adjacent to a public street (or a public area) has some objectively reasonable expectation of privacy in that garbage."[12] But it is error for the court to then: rely on technical notions about location and abandonment of property while ignoring the practical realities of (1) why garbage is placed curbside for routine collection and (2) the communal nature of residential garbage; apply privacy considerations to things and places rather than people; ignore Chief Justice Rabinowitz's concept of differential expectations of privacy; and conclude that the objectively reasonable expectation of privacy in garbage set out for routine collection is significantly lessened because the person "not only intends to expose the garbage to routine pickup, but also risks potential intrusions by intermeddling humans (even garbage collectors), and the possibility that animals, snow plows, and wind may reveal the contents of the garbage containers."

### 2. Practical Realities, Misplaced Reliance, and Differential Expectations of Privacy

In Alaska we have a system of government-run garbage landfills, government-per-

---

6. *Smith*, 510 P.2d at 801 (Rabinowitz, C.J., dissenting) (quoting *People v. Edwards*, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713, 715 (1969)).

7. *Id.* at 803.

8. *Id.*

9. *Id.* Chief Justice Rabinowitz gave the example of a telephone caller on a "party line" who might reasonably expect others on the party line to overhear conversations but still would not expect the government to conduct full-scale warrantless taps of telephone conversations. *Id.* That example seems quaint today, but the same might now be said of mobile phone users: they understand that when they talk in public areas others will overhear at least one end of their conversations. Mobile phone users may therefore have a diminished expectation of privacy, but they do not expect the government to conduct full-scale warrantless interceptions of their conversations. Similarly, those who access the internet recognize the possibility that hackers may successfully penetrate their computers and obtain personal

information; despite this diminished expectation of privacy, those individuals do not expect the government to do the same without a search warrant. Chief Justice Rabinowitz also noted that a "hotel guest may reasonably expect a maid to enter his room to clean up, but absent unusual circumstances he should not be held to expect that a hotel clerk will lead the police on a search of his room." *Id.* (quoting *People v. Krivda*, 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262, 1269 (1971) (internal quotations marks and citations omitted)). Similarly, just because a person has a cleaning service come into the home, there is no expectation that the police will search the home without a warrant.

10. *Id.* at 799.

11. *Id.* at 800, 804–05.

12. I interpret "on or adjacent to a public street (or a public area)" to be essentially the same as "curbside" and assume any difference is immaterial in light of the condition that the garbage be set out for routine collection.

formed garbage collection (or governmental regulation of private collectors), and government-imposed rules and regulations about how residents must store garbage on their property and where they must place it for collection.[13] Some communities make the use of their municipal garbage collection services mandatory.[14] Those municipalities not mandating use of municipal collection services still extensively regulate garbage disposal.[15]

Aside from surreptitious video or audio recordings, garbage may provide the best evidence of what people do in the privacy of their homes.[16] As the court acknowledges, it is now possible to analyze a person's garbage and learn a great deal about the person's activities and associations, even to obtain "DNA for testing and for investigation." Yet the government generally controls how its citizens may store and dispose of their garbage, and a citizen generally has no choice but to participate in the government's collection and disposal system, including following the rules about where to place garbage for collection. Therefore, to the extent the court

relies on the specific location of garbage set out for collection to show a lessened expectation of privacy, that reliance is misplaced— the constitutional right of privacy protects people, not places,[17] and for most Alaskans the residential garbage collection place is controlled by municipal ordinances having nothing to do with the individual's objective expectation of privacy.

The court's reliance on its conception of abandonment is similarly misplaced. It is, as the court suggests, entirely possible that despite comprehensive regulation of the storage and presentation of garbage for collection, individuals are at some risk of children or dogs or snowplows making mischief and scattering the contents of their garbage containers. But this neither constitutes abandonment nor justifies the government's warrantless seizures and searches of garbage that has *not* been scattered by such mischief. Chief Justice Rabinowitz's concept of differential expectations of privacy makes abundant sense in this context, leading me to conclude that today's new rule provides insufficient protection to Alaska residents.

**13.** For example, in Seward those who use their own garbage containers must place them for collection "abutting a dedicated public right-of-way," but those who use the city's garbage containers may place them for collection "upon the public right-of-way." Seward Mun.Code 14.05.025(b). In Sitka individuals must place garbage receptacles for collection in convenient locations "designated by the director of public works." Sitka Mun.Code 15.06.015. Anchorage Municipal Ordinances differentiate between residents whose houses abut alleys and those who live in "areas without alleys"; the former are required to leave containers "in the alley," but the latter are required merely to leave receptacles "at the street." Anchorage Mun.Code 26.70.050(D)-(E). In both Wrangell and Cordova individuals must leave garbage containers for collection "in plain view in an accessible location at the ground level or on an open platform or open porch not more than four feet above the adjacent roadway and so placed that they may be reached from the ground by the collector." Wrangell Mun.Code 15.18.040(A); Cordova Mun. Code 08.12.110. The Kodiak Island Borough requires that "[i]tems to be collected ... be placed within five feet of the route of the collection vehicle and shall be placed loose on the ground"—unless the property owner installs racks for the placement of garbage containers, in which case they "may not be placed or located on the traveled right-of-way." Kodiak Island Borough Mun.Code 08.25.080. In Kenai containers may not be placed "within the traversed

right-of-way of a street or alley" but may be placed "off the traveled portion" of the right-of-way if "necessary for expeditious collection." Kenai Mun.Code 09.10.030. Fairbanksans must place their garbage containers "at curbside or at the edge of the alley" but not "within the street or alley right-of-way." Fairbanks Mun.Code 66–68.

**14.** *See, e.g.,* Anchorage Mun.Code 26.70.030; Cordova Mun.Code 8.12.130(A); Fairbanks Mun. Code 66–2; Kodiak Island Borough Code 08.25.030; Palmer Mun.Code 08.20.010; Sitka Mun.Code 09.08.025(A); Valdez Mun.Code 08.08.040(c); Wrangell Mun.Code 15.18.070(A).

**15.** *See, e.g.,* Dillingham Mun.Code 08.04.030– 08.04.110 (governing size of garbage containers, structure of garbage containers, vehicles used to transport waste, placement of containers, requirements for landlords, frequency of disposal, and fees for use of the city's solid waste disposal facility).

**16.** The court has zealously guarded Alaskans' personal privacy in their homes. *See, e.g., Ravin v. State,* 537 P.2d 494, 503–04 (Alaska 1975) (discussing constitutional right of privacy in the home).

**17.** *Smith,* 510 P.2d at 800 (Rabinowitz, C.J., dissenting).

What is—or should be—the only relevant factor is an individual's objective intent when placing containerized garbage in the required location for collection. The key question is whether the individual intends to disclose the contents to the world at large, or to unobtrusively dispose of the contents in accordance with custom or rules and regulations imposed for the health and safety of the community.[18]

The court finds fault with Chief Justice Rabinowitz's standard using a "slippery slope" analysis, suggesting it "would seem to foreclose warrantless searches of garbage even after the garbage bags have reached a landfill." It would be easy to follow the court's convention and simply say that specific issue is not before us, but in any event the court's concern is misplaced. Chief Justice Rabinowitz's standard focuses on an individual's intent, discerned by examining the individual's behavior. That behavior generally involves the placement of garbage in a bag and the placement of that bag for collection (usually in accordance with a local ordinance). That behavior does not demonstrate an intent *never* to disclose the contents of the garbage. But neither does it demonstrate an intent to "abandon" the garbage to any passer-by—whether it be a child, animal, or police officer—once it is placed for collection. It generally demonstrates an intent that the garbage not be disclosed except in the normal course when it reaches its final destination and is commingled with the rest of the community's garbage by someone specifically tasked with collecting and handling garbage. This case is illustrative of that point: Beltz placed his garbage in a bag, placed the bag in a garbage container in a garbage cart, and placed the garbage cart near the edge of the Beltz property so the garbage collector could collect and dispose of the garbage in the normal course. This behavior objectively manifested an intent that the garbage remain undisclosed until the garbage collector disposed of it in the normal course.

### 3. Collateral Consequences

The court's new rule produces two noteworthy collateral consequences demonstrating the constitutional privacy right announced today is mostly illusory.

First, despite a laudable admonition that police may not institute "garbage sweeps," some garbage sweeps are in fact allowable under the new rule. It should come as no surprise that most residences have multiple occupants, each of whom has a constitutionally protected right of privacy in his or her garbage. Here the court notes that Beltz lived with his father and that the garbage cart, bin, and lid belonged "to the Beltz household." The testimony at the suppression hearing revealed that the residential property was owned by Beltz's father. The police admitted that they seized and searched the garbage bags from the Beltz household without any specific information about who: (1) actually produced the garbage; (2) placed the garbage in those bags; or (3) placed those bags of garbage in and on the garbage bins.

Under today's rule the police may seize and search an entire household's garbage without a warrant based on a reasonable suspicion that one member of the household is engaging in a serious crime and evidence of that crime may be somewhere in the household garbage. By extension, if the police had a reasonable suspicion that Beltz was disposing of crime-related evidence in the next-door-neighbor's garbage, they could have made a warrantless seizure and search of that garbage as well. And nothing in today's rule prevents the police from seizing and searching all of the contents of an apartment complex garbage receptacle when focused on the conduct of one individual resident.[19] These are garbage sweeps that

---

18. An example of the former may be when a person places uncovered or un-containerized items in open display at curbside, perhaps for people to take for re-use, in which case no search warrant would be required to seize and search the items left in plain view. Here a police officer testified that nothing incriminating was in plain view before the garbage was seized and searched.

19. The court makes light of this concern, again emphasizing the supposed narrowness of its decision by stating it does not decide "whether reasonable suspicion as to one resident of an apartment building would justify a search of the entire building's garbage left on or near the street for collection." But the court's decision is subject to the same "slippery slope" analysis it applies to Chief Justice Rabinowitz's privacy standard. If

should be allowed only with a search warrant, especially considering that nothing in today's rule appears to prevent the police from analyzing the garbage of people other than the target of the original investigation, compiling information about them, or charging them with crimes based on information found in their garbage. It would be naive to believe DNA data compilations and registries created from police seizures and searches of garbage are not in Alaska's future.

Second, despite today's holding that an individual has a constitutional right of privacy in garbage left in the normal course for routine collection, the natural corollary of allowing garbage sweeps is that the constitutional right is illusory for most of the people whose garbage will be seized and searched. It will be the exception, rather than the rule, when the police can limit their seizure and search to garbage of the individual under suspicion for a serious crime.

Consider, for example, the newly announced constitutional right of privacy as afforded to Beltz's father.

Suppose that Beltz's father had committed some unrelated crime, serious or otherwise, and that the police had found evidence of that crime in their sweep of the Beltz household garbage. Could the police have used that evidence in a prosecution of Beltz's father? He had a reasonable expectation of privacy in his garbage and the police had no suspicion about him, let alone an articulable and individualized reasonable suspicion that he was engaging in a serious crime. Would his article I, sections 14 and 22 rights mandate suppression of the evidence? Or would

suppression be denied because under the rule announced today the police otherwise had legal authority to seize and search the garbage and therefore to act on the evidence that came into plain view? [20] The court finds the latter result acceptable, comparing it to what can occur during a police search of a home occupied by multiple residents. But to initially enter that hypothetical home, the police would have needed a warrant, consent, or the presence of exigent circumstances, none of which are necessary for the seizure and search of the garbage. The constitutional privacy right is illusory in this context.

Here, of course, there is no indication whatsoever that Beltz's father was suspected of committing a crime. The police nonetheless seized his garbage cans from his garbage cart and searched his garbage, and he has no information about what the police did with his garbage or what data about him the police have compiled from that garbage. The constitutional privacy right is thus equally illusory in this context.

Consider yet another context. After today, police are on notice of an individual's constitutional privacy rights in garbage set out for routine collection. If the facts of this case took place tomorrow, given that the residence, the garbage cart, and the garbage cans all belonged to Beltz's father, the seizure and search of the contents of the garbage cans might be considered a deliberate violation of Beltz's father's constitutional rights for the express purpose of obtaining incriminating evidence against his son. If so, then Beltz might have vicarious standing to raise the constitutional violation and seek

---

the police can seize and search an entire household's garbage left at curbside based on a reasonable suspicion about one person in the household, what distinction prevents the police from seizing and searching all of the garbage placed in the street in front of a duplex or small apartment building based on a reasonable suspicion about one resident? And because the court has not repudiated *Smith,* what part of today's decision suggests any limitation on seizing and searching garbage from a larger apartment complex receptacle on the apartment grounds based on reasonable suspicion about one resident? "Carried to its logical conclusion," the court's new standard may allow the seizure and search of all residential garbage on a street or in a neighborhood based on the reasonable suspicion that a specific

individual is engaging in a serious crime somewhere along the street or in the neighborhood and that evidence can be found somewhere in the garbage.

20. *See, e.g., Newhall v. State,* 843 P.2d 1254, 1257 (Alaska App.1992) (describing " 'three basic requirements for a valid 'plain view' seizure of evidence: (1) the initial intrusion which afforded the view must have been lawful; (2) the discovery of the evidence must have been inadvertent; and (3) the incriminating nature of the evidence must have been immediately apparent' " (quoting *Reeves v. State,* 599 P.2d 727, 738 (Alaska 1979))).

suppression of the incriminating evidence.[21] But given the tenor of today's decision, it appears more likely the court would conclude Beltz's father's constitutional privacy rights were not violated, further demonstrating the rather illusory nature of the constitutional privacy right announced today.

### 4. Ironies

Finally, I note two ironies arising from this case.

First, the court suggests that a search warrant might have been required after the first seizures and searches of the Beltz household garbage gave the police "the first incriminating evidence" that a crime had been committed. If this is so, a warrantless seizure and search of garbage is acceptable when the police have merely a reasonable suspicion that the garbage may contain evidence of a serious crime, but a warrant is required when the police clearly have probable cause to believe a crime has been committed and further evidence may be found in the accused's garbage. This does little to honor either the constitutional right of privacy or the necessity of search warrants.

Nothing in today's rule prevents continual warrantless seizures and searches of garbage regardless of what the police actually find on any given occasion; today's rule is just an evidence-gathering rule obviating the need for a search warrant. Here the police continued to seize and search garbage from the Beltz household for several weeks even though they had no new information from any source about additional purchases of methamphetamine material. This and other long-term targeted garbage seizures and searches based on single suspicious incidents appear legitimate under today's rule, despite the historical premise that warrantless

searches based on reasonable suspicion are necessary to avoid *imminent* public danger.[22]

Second, the police actually had probable cause to obtain a search warrant for Beltz's residence and his garbage based on the information provided by the store personnel, even before the seizures and searches of the Beltz household garbage. The police had ample time to obtain a search warrant in this case but, in light of the federal rule and *Smith,* they chose not to do so. Adopting Chief Justice Rabinowitz's standard would thus not have prevented the police from obtaining the evidence they sought in this case; it would merely have ensured that they went through proper procedures to obtain it—procedures that reflect our prioritization of individual rights. If the police had lacked time to obtain a search warrant, existing search and seizure law provided an exigency exception: "Exigent circumstances justifying a warrantless search or seizure may be established by the existence of probable cause, coupled with a 'compelling need for official action and no time to secure a warrant.'"[23] Today's rule simply enables police to sidestep the procedural protections offered by the warrant requirement.

### 5. Conclusion

When otherwise faced with the federal rule, transplanting the reasonable suspicion framework from investigatory stops to seizures and searches of garbage left for collection might at first blush seem a reasonable and adequate check on police conduct. But Chief Justice Rabinowitz again had the correct response over thirty-five years ago:

> In my judgment, it is preferable to entrust the decision to invade citizens' privacy to the scrutiny of neutral judicial officials rather than police officers—even police officers operating under great self-restraint.

---

21. See *Waring v. State,* 670 P.2d 357, 360–63 (Alaska 1983) (defendant has vicarious standing to assert deliberate violation of co-defendant's Fourth Amendment rights); *Fraiman v. State, Dep't of Admin., Div. of Motor Vehicles,* 49 P.3d 241, 245 n. 18 (Alaska 2002) (noting that vicarious standing under *Waring* appears to apply to the deliberate violation of any third-party's constitutional rights, not just those of a co-defendant).

22. I acknowledge the dangers involved in methamphetamine production. Yet the conduct of the police in this case precludes any suggestion that they believed Beltz's conduct created imminent public danger.

23. *Ingram v. State,* 703 P.2d 415, 422 (Alaska App.1985) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)).

As the United States Supreme Court noted in *McDonald v. United States:*

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.[24]

To the extent today's rule affords Alaskans any protection, it is better than the federal rule. But a far better course would be to apply the rule proposed by Chief Justice Rabinowitz. The people of Alaska deserve a rule that jealously protects their constitutional right of privacy, and I would adopt a rule requiring police to obtain a warrant to seize and search garbage that is left for collection in the normal course. I would therefore reverse the court of appeals's decision and reinstate the trial court's suppression ruling.

---

24. *Smith*, 510 P.2d at 800 (quoting *McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 93 L.Ed. 153 (1948)) (internal citations omitted).